(Slip Opinion) OCTOBER TERM, 2011 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## UNITED STATES *v.* ALVAREZ

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 11–210.   Argued February 22, 2012—Decided June 28, 2012

The Stolen Valor Act makes it a crime to falsely claim receipt of military decorations or medals and provides an enhanced penalty if the Congressional Medal of Honor is involved. 18 U. S. C. §§704 (b), (c). Respondent pleaded guilty to a charge of falsely claiming that he had received the Medal of Honor, but reserved his right to appeal his claim that the Act is unconstitutional. The Ninth Circuit reversed, finding the Act invalid under the First Amendment.

*Held:* The judgment is affirmed. Pp. 3−18.

617 F. 3d 1198, affirmed.

JUSTICE KENNEDY, joined by THE CHIEF JUSTICE, JUSTICE GINSBURG, and JUSTICE SOTOMAYOR, concluded that the Act infringes upon speech protected by the First Amendment. Pp. 3–18.

(a) The Constitution "demands that content-based restrictions on speech be presumed invalid . . . and that the Government bear the burden of showing their constitutionality." *Ashcroft* v. *American Civil Liberties Union,* 542 U. S. 656, 660.

Content-based restrictions on speech have been permitted only for a few historic categories of speech, including incitement, obscenity, defamation, speech integral to criminal conduct, so-called "fighting words," child pornography, fraud, true threats, and speech presenting some grave and imminent threat the Government has the power to prevent.

Absent from these few categories is any general exception for false statements. The Government argues that cases such as *Hustler Magazine, Inc.*, v. *Falwell*, 485 U. S. 46, 52, support its claim that false statements have no value and hence no First Amendment protection. But all the Government's quotations derive from cases dis-

cussing defamation, fraud, or some other legally cognizable harm associated with a false statement. In those decisions the falsity of the speech at issue was not irrelevant to the Court's analysis, but neither was it determinative. These prior decisions have not confronted a measure, like the Stolen Valor Act, that targets falsity and nothing more.

Even when considering some instances of defamation or fraud, the Court has instructed that falsity alone may not suffice to bring the speech outside the First Amendment; the statement must be a knowing and reckless falsehood. See *New York Times* v. *Sullivan*, 376 U. S. 254, 280. Here, the Government seeks to convert a rule that limits liability even in defamation cases where the law permits recovery for tortious wrongs into a rule that expands liability in a different, far greater realm of discourse and expression.

The Government's three examples of false-speech regulation that courts generally have found permissible do not establish a principle that all proscriptions of false statements are exempt from rigorous First Amendment scrutiny. The criminal prohibition of a false statement made to Government officials in communications concerning official matters, 18 U. S. C. §1001, does not lead to the broader proposition that false statements are unprotected when made to any person, at any time, in any context. As for perjury statutes, perjured statements lack First Amendment protection not simply because they are false, but because perjury undermines the function and province of the law and threatens the integrity of judgments. Finally, there are statutes that prohibit falsely representing that one is speaking on behalf of the Government, or prohibit impersonating a Government officer. These examples, to the extent that they implicate fraud or speech integral to criminal conduct, are inapplicable here.

While there may exist "some categories of speech that have been historically unprotected," but that the Court has not yet specifically identified or discussed, *United States* v. *Stevens,* 559 U. S. ___, ___, the Government has not demonstrated that false statements should constitute a new category. Pp. 3−10.

(b) The Act seeks to control and suppress all false statements on this one subject in almost limitless times and settings without regard to whether the lie was made for the purpose of material gain. Permitting the Government to decree this speech to be a criminal offense would endorse government authority to compile a list of subjects about which false statements are punishable. That governmental power has no clear limiting principle. Pp. 10−11.

(c) The Court applies the "most exacting scrutiny" in assessing content-based restrictions on protected speech. *Turner Broadcasting System Inc.* v. *FCC,* 512 U. S. 622, 642. The Act does not satisfy that

scrutiny. While the Government's interest in protecting the integrity of the Medal of Honor is beyond question, the First Amendment requires that there be a direct causal link between the restriction imposed and the injury to be prevented. Here, that link has not been shown. The Government points to no evidence supporting its claim that the public's general perception of military awards is diluted by false claims such as those made by respondent. And it has not shown, and cannot show, why counterspeech, such as the ridicule respondent received online and in the press, would not suffice to achieve its interest.

In addition, when the Government seeks to regulate protected speech, the restriction must be the "least restrictive means among available, effective alternatives." *Ashcroft,* 542 U. S., at 666. Here, the Government could likely protect the integrity of the military awards system by creating a database of Medal winners accessible and searchable on the Internet, as some private individuals have already done. Pp. 12−18.

JUSTICE BREYER, joined by JUSTICE KAGAN, concluded that because the Stolen Valor Act, as presently drafted, works disproportionate constitutional harm, it fails intermediate scrutiny, and thus violates the First Amendment. Pp. 1−10.

(a) In determining whether a statute violates the First Amendment, the Court has often found it appropriate to examine the fit between statutory ends and means, taking into account the seriousness of the speech-related harm the provision will likely cause, the nature and importance of the provision's countervailing objectives, the extent to which the statute will tend to achieve those objectives, and whether there are other, less restrictive alternatives. "Intermediate scrutiny" describes this approach. Since false factual statements are less likely than true factual statements to make a valuable contribution to the marketplace of ideas, and the government often has good reason to prohibit such false speech, but its regulation can threaten speech-related harm, such an approach is applied here. Pp. 1−3.

(b) The Act should be read as criminalizing only false factual statements made with knowledge of their falsity and with intent that they be taken as true. Although the Court has frequently said or implied that false factual statements enjoy little First Amendment protection, see, *e.g., Gertz* v. *Robert Welch, Inc.*, 418 U. S. 323, 340, those statements cannot be read to mean "no protection at all." False factual statements serve useful human objectives in many contexts. Moreover, the threat of criminal prosecution for making a false statement can inhibit the speaker from making true statements, thereby "chilling" a kind of speech that lies at the First Amendment's heart. See *id.,* at 340−341. And the pervasiveness of false factual

statements provides a weapon to a government broadly empowered to prosecute falsity without more. Those who are unpopular may fear that the government will use that weapon selectively against them.

Although there are many statutes and common-law doctrines making the utterance of certain kinds of false statements unlawful, they tend to be narrower than the Act, in that they limit the scope of their application in various ways, for example, by requiring proof of specific harm to identifiable victims. The Act lacks any such limiting features. Although it prohibits only knowing and intentional falsehoods about readily verifiable facts within the personal knowledge of the speaker, it otherwise ranges broadly, and that breadth means that it creates a significant risk of First Amendment harm. Pp. 3−8.

(c) The Act nonetheless has substantial justification. It seeks to protect the interests of those who have sacrificed their health and life for their country by seeking to preserve intact the country's recognition of that sacrifice in the form of military honors. P. 8.

(d) It may, however, be possible substantially to achieve the Government's objective in less burdensome ways. The First Amendment risks flowing from the Act's breadth of coverage could be diminished or eliminated by a more finely tailored statute, for example, a statute that requires a showing that the false statement caused specific harm or is focused on lies more likely to be harmful or on contexts where such lies are likely to cause harm. Pp. 8−10.

KENNEDY, J., announced the judgment of the Court and delivered an opinion, in which ROBERTS, C. J., and GINSBURG and SOTOMAYOR, JJ., joined. BREYER, J., filed an opinion concurring in the judgment, in which KAGAN, J., joined. ALITO, J., filed a dissenting opinion, in which SCALIA and THOMAS, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———————

No. 11–210

———————

## UNITED STATES, PETITIONER *v.* XAVIER ALVAREZ

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 28, 2012]

JUSTICE KENNEDY announced the judgment of the Court and delivered an opinion, in which THE CHIEF JUSTICE, JUSTICE GINSBURG, and JUSTICE SOTOMAYOR join.

Lying was his habit. Xavier Alvarez, the respondent here, lied when he said that he played hockey for the Detroit Red Wings and that he once married a starlet from Mexico. But when he lied in announcing he held the Congressional Medal of Honor, respondent ventured onto new ground; for that lie violates a federal criminal statute, the Stolen Valor Act of 2005. 18 U. S. C. §704.

In 2007, respondent attended his first public meeting as a board member of the Three Valley Water District Board. The board is a governmental entity with headquarters in Claremont, California. He introduced himself as follows: "I'm a retired marine of 25 years. I retired in the year 2001. Back in 1987, I was awarded the Congressional Medal of Honor. I got wounded many times by the same guy." 617 F. 3d 1198, 1201–1202 (CA9 2010). None of this was true. For all the record shows, respondent's statements were but a pathetic attempt to gain respect that eluded him. The statements do not seem to have been made to secure

employment or financial benefits or admission to privileges reserved for those who had earned the Medal.

Respondent was indicted under the Stolen Valor Act for lying about the Congressional Medal of Honor at the meeting. The United States District Court for the Central District of California rejected his claim that the statute is invalid under the First Amendment. Respondent pleaded guilty to one count, reserving the right to appeal on his First Amendment claim. The United States Court of Appeals for the Ninth Circuit, in a decision by a divided panel, found the Act invalid under the First Amendment and reversed the conviction. *Id.*, at 1218. With further opinions on the issue, and over a dissent by seven judges, rehearing en banc was denied. 638 F. 3d 666 (2011). This Court granted certiorari. 565 U. S. ___ (2011).

After certiorari was granted, and in an unrelated case, the United States Court of Appeals for the Tenth Circuit, also in a decision by a divided panel, found the Act constitutional. *United States* v. *Strandlof*, 667 F. 3d 1146 (2012). So there is now a conflict in the Courts of Appeals on the question of the Act's validity.

This is the second case in two Terms requiring the Court to consider speech that can disparage, or attempt to steal, honor that belongs to those who fought for this Nation in battle. See *Snyder* v. *Phelps*, 562 U. S. ___ (2011) (hateful protests directed at the funeral of a serviceman who died in Iraq). Here the statement that the speaker held the Medal was an intended, undoubted lie.

It is right and proper that Congress, over a century ago, established an award so the Nation can hold in its highest respect and esteem those who, in the course of carrying out the "supreme and noble duty of contributing to the defense of the rights and honor of the nation," *Selective Draft Law Cases,* 245 U. S. 366, 390 (1918), have acted with extraordinary honor. And it should be uncontested that this is a legitimate Government objective, indeed a

most valued national aspiration and purpose. This does not end the inquiry, however. Fundamental constitutional principles require that laws enacted to honor the brave must be consistent with the precepts of the Constitution for which they fought.

The Government contends the criminal prohibition is a proper means to further its purpose in creating and awarding the Medal. When content-based speech regulation is in question, however, exacting scrutiny is required. Statutes suppressing or restricting speech must be judged by the sometimes inconvenient principles of the First Amendment. By this measure, the statutory provisions under which respondent was convicted must be held invalid, and his conviction must be set aside.

## I

Respondent's claim to hold the Congressional Medal of Honor was false. There is no room to argue about interpretation or shades of meaning. On this premise, respondent violated §704(b); and, because the lie concerned the Congressional Medal of Honor, he was subject to an enhanced penalty under subsection (c). Those statutory provisions are as follows:

> "(b) FALSE CLAIMS ABOUT RECEIPT OF MILITARY DECORATIONS OR MEDALS.—Whoever falsely represents himself or herself, verbally or in writing, to have been awarded any decoration or medal authorized by Congress for the Armed Forces of the United States . . . shall be fined under this title, imprisoned not more than six months, or both.
>
> "(c) ENHANCED PENALTY FOR OFFENSES INVOLVING CONGRESSIONAL MEDAL OF HONOR.—
>
> "(1) IN GENERAL.—If a decoration or medal involved in an offense under subsection (a) or (b) is a Congressional Medal of Honor, in lieu of the punishment provided in that subsection, the offender shall be fined under

this title, imprisoned not more than 1 year, or both."

Respondent challenges the statute as a content-based suppression of pure speech, speech not falling within any of the few categories of expression where content-based regulation is permissible. The Government defends the statute as necessary to preserve the integrity and purpose of the Medal, an integrity and purpose it contends are compromised and frustrated by the false statements the statute prohibits. It argues that false statements "have no First Amendment value in themselves," and thus "are protected only to the extent needed to avoid chilling fully protected speech." Brief for United States 18, 20. Although the statute covers respondent's speech, the Government argues that it leaves breathing room for protected speech, for example speech which might criticize the idea of the Medal or the importance of the military. The Government's arguments cannot suffice to save the statute.

## II

"[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft* v. *American Civil Liberties Union*, 535 U. S. 564, 573 (2002) (internal quotation marks omitted). As a result, the Constitution "demands that content-based restrictions on speech be presumed invalid . . . and that the Government bear the burden of showing their constitutionality." *Ashcroft* v. *American Civil Liberties Union*, 542 U. S. 656, 660 (2004).

In light of the substantial and expansive threats to free expression posed by content-based restrictions, this Court has rejected as "startling and dangerous" a "free-floating test for First Amendment coverage . . . [based on] an ad hoc balancing of relative social costs and benefits." *United States* v. *Stevens*, 559 U. S. ___, ___ (2010) (slip op.,

at 7). Instead, content-based restrictions on speech have been permitted, as a general matter, only when confined to the few "'historic and traditional categories [of expression] long familiar to the bar,'" *Id.,* at \_\_\_ (slip op., at 5) (quoting *Simon & Schuster, Inc.* v. *Members of N. Y. State Crime Victims Bd.*, 502 U. S. 105, 127 (1991) (KENNEDY, J., concurring in judgment)). Among these categories are advocacy intended, and likely, to incite imminent lawless action, see *Brandenburg* v. *Ohio*, 395 U. S. 444 (1969) *(per curiam);* obscenity, see, *e.g., Miller* v. *California*, 413 U. S. 15 (1973); defamation, see, *e.g., New York Times Co.* v. *Sullivan*, 376 U. S. 254 (1964) (providing substantial protection for speech about public figures); *Gertz* v. *Robert Welch, Inc.*, 418 U. S. 323 (1974) (imposing some limits on liability for defaming a private figure); speech integral to criminal conduct, see, *e.g., Giboney* v. *Empire Storage & Ice Co.*, 336 U. S. 490 (1949); so-called "fighting words," see *Chaplinsky* v. *New Hampshire*, 315 U. S. 568 (1942); child pornography, see *New York* v. *Ferber*, 458 U. S. 747 (1982); fraud, see *Virginia Bd. of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748, 771 (1976); true threats, see *Watts* v. *United States*, 394 U. S. 705 (1969) *(per curiam);* and speech presenting some grave and imminent threat the government has the power to prevent, see *Near* v. *Minnesota ex rel. Olson*, 283 U. S. 697, 716 (1931), although a restriction under the last category is most difficult to sustain, see *New York Times Co.* v. *United States*, 403 U. S. 713 (1971) *(per curiam).* These categories have a historical foundation in the Court's free speech tradition. The vast realm of free speech and thought always protected in our tradition can still thrive, and even be furthered, by adherence to those categories and rules.

Absent from those few categories where the law allows content-based regulation of speech is any general exception to the First Amendment for false statements. This

comports with the common understanding that some false statements are inevitable if there is to be an open and vigorous expression of views in public and private conversation, expression the First Amendment seeks to guarantee. See *Sullivan, supra,* at 271 ("Th[e] erroneous statement is inevitable in free debate").

The Government disagrees with this proposition. It cites language from some of this Court's precedents to support its contention that false statements have no value and hence no First Amendment protection. See also Brief for Eugene Volokh et al. as *Amici Curiae* 2–11. These isolated statements in some earlier decisions do not support the Government's submission that false statements, as a general rule, are beyond constitutional protection. That conclusion would take the quoted language far from its proper context. For instance, the Court has stated "[f]alse statements of fact are particularly valueless [because] they interfere with the truth-seeking function of the marketplace of ideas," *Hustler Magazine, Inc.* v. *Falwell*, 485 U. S. 46, 52 (1988), and that false statements "are not protected by the First Amendment in the same manner as truthful statements," *Brown* v. *Hartlage*, 456 U. S. 45, 60–61 (1982). See also, *e.g., Virginia Bd. of Pharmacy*, *supra*, at 771 ("Untruthful speech, commercial or otherwise, has never been protected for its own sake"); *Herbert* v. *Lando*, 441 U. S. 153, 171 (1979) ("Spreading false information in and of itself carries no First Amendment credentials"); *Gertz*, *supra*, at 340 ("[T]here is no constitutional value in false statements of fact"); *Garrison* v. *Louisiana*, 379 U. S. 64, 75 (1964) ("[T]he knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection").

These quotations all derive from cases discussing defamation, fraud, or some other legally cognizable harm associated with a false statement, such as an invasion of

privacy or the costs of vexatious litigation. See Brief for United States 18–19. In those decisions the falsity of the speech at issue was not irrelevant to our analysis, but neither was it determinative. The Court has never endorsed the categorical rule the Government advances: that false statements receive no First Amendment protection. Our prior decisions have not confronted a measure, like the Stolen Valor Act, that targets falsity and nothing more.

Even when considering some instances of defamation and fraud, moreover, the Court has been careful to instruct that falsity alone may not suffice to bring the speech outside the First Amendment. The statement must be a knowing or reckless falsehood. See *Sullivan, supra,* at 280 (prohibiting recovery of damages for a defamatory falsehood made about a public official unless the statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not"); see also *Garrison, supra,* at 73 ("[E]ven when the utterance is false, the great principles of the Constitution which secure freedom of expression . . . preclude attaching adverse consequences to any except the knowing or reckless falsehood"); *Illinois ex rel. Madigan* v. *Telemarketing Associates, Inc.,* 538 U. S. 600, 620 (2003) ("False statement alone does not subject a fundraiser to fraud liability").

The Government thus seeks to use this principle for a new purpose. It seeks to convert a rule that limits liability even in defamation cases where the law permits recovery for tortious wrongs into a rule that expands liability in a different, far greater realm of discourse and expression. That inverts the rationale for the exception. The requirements of a knowing falsehood or reckless disregard for the truth as the condition for recovery in certain defamation cases exists to allow more speech, not less. A rule designed to tolerate certain speech ought not blossom to become a rationale for a rule restricting it.

The Government then gives three examples of regulations on false speech that courts generally have found permissible: first, the criminal prohibition of a false statement made to a Government official, 18 U. S. C. §1001; second, laws punishing perjury; and third, prohibitions on the false representation that one is speaking as a Government official or on behalf of the Government, see, *e.g.,* §912; §709. These restrictions, however, do not establish a principle that all proscriptions of false statements are exempt from exacting First Amendment scrutiny.

The federal statute prohibiting false statements to Government officials punishes "whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government . . . makes any materially false, fictitious, or fraudulent statement or representation." §1001. Section 1001's prohibition on false statements made to Government officials, in communications concerning official matters, does not lead to the broader proposition that false statements are unprotected when made to any person, at any time, in any context.

The same point can be made about what the Court has confirmed is the "unquestioned constitutionality of perjury statutes," both the federal statute, §1623, and its state-law equivalents. *United States* v. *Grayson*, 438 U. S. 41, 54 (1978). See also *Konigsberg* v. *State Bar of Cal.*, 366 U. S. 36, 51, n. 10 (1961). It is not simply because perjured statements are false that they lack First Amendment protection. Perjured testimony "is at war with justice" because it can cause a court to render a "judgment not resting on truth." *In re Michael*, 326 U. S. 224, 227 (1945). Perjury undermines the function and province of the law and threatens the integrity of judgments that are the basis of the legal system. See *United States* v. *Dunnigan*, 507 U. S. 87, 97 (1993) ("To uphold the integrity of our trial system . . . the constitutionality of perjury statutes is unquestioned"). Unlike speech in other contexts, testi-

mony under oath has the formality and gravity necessary to remind the witness that his or her statements will be the basis for official governmental action, action that often affects the rights and liberties of others. Sworn testimony is quite distinct from lies not spoken under oath and simply intended to puff up oneself.

Statutes that prohibit falsely representing that one is speaking on behalf of the Government, or that prohibit impersonating a Government officer, also protect the integrity of Government processes, quite apart from merely restricting false speech. Title 18 U. S. C. §912, for example, prohibits impersonating an officer or employee of the United States. Even if that statute may not require proving an "actual financial or property loss" resulting from the deception, the statute is itself confined to "maintain[ing] the general good repute and dignity of . . . government . . . service itself." *United States* v. *Lepowitch*, 318 U. S. 702, 704 (1943) (internal quotation marks omitted). The same can be said for prohibitions on the unauthorized use of the names of federal agencies such as the Federal Bureau of Investigation in a manner calculated to convey that the communication is approved, see §709, or using words such as "Federal" or "United States" in the collection of private debts in order to convey that the communication has official authorization, see §712. These examples, to the extent that they implicate fraud or speech integral to criminal conduct, are inapplicable here.

As our law and tradition show, then, there are instances in which the falsity of speech bears upon whether it is protected. Some false speech may be prohibited even if analogous true speech could not be. This opinion does not imply that any of these targeted prohibitions are somehow vulnerable. But it also rejects the notion that false speech should be in a general category that is presumptively unprotected.

Although the First Amendment stands against any

"freewheeling authority to declare new categories of speech outside the scope of the First Amendment," *Stevens*, 559 U. S., at ___ (slip op., at 9), the Court has acknowledged that perhaps there exist "some categories of speech that have been historically unprotected . . . but have not yet been specifically identified or discussed . . . in our case law." *Ibid.* Before exempting a category of speech from the normal prohibition on content-based restrictions, however, the Court must be presented with "persuasive evidence that a novel restriction on content is part of a long (if heretofore unrecognized) tradition of proscription," *Brown* v. *Entertainment Merchants Assn.,* 564 U. S. ___, ___ (2011) (slip op., at 4). The Government has not demonstrated that false statements generally should constitute a new category of unprotected speech on this basis.

### III

The probable, and adverse, effect of the Act on freedom of expression illustrates, in a fundamental way, the reasons for the Law's distrust of content-based speech prohibitions.

The Act by its plain terms applies to a false statement made at any time, in any place, to any person. It can be assumed that it would not apply to, say, a theatrical performance. See *Milkovich* v. *Lorain Journal Co.*, 497 U. S. 1, 20 (1990) (recognizing that some statements nominally purporting to contain false facts in reality "cannot reasonably be interpreted as stating actual facts about an individual" (internal quotation marks and brackets omitted)). Still, the sweeping, quite unprecedented reach of the statute puts it in conflict with the First Amendment. Here the lie was made in a public meeting, but the statute would apply with equal force to personal, whispered conversations within a home. The statute seeks to control and suppress all false statements on this one subject in

almost limitless times and settings. And it does so entirely without regard to whether the lie was made for the purpose of material gain. See *San Francisco Arts & Athletics, Inc.* v. *United States Olympic Comm.*, 483 U. S. 522, 539–540 (1987) (prohibiting a nonprofit corporation from exploiting the "commercial magnetism" of the word "Olympic" when organizing an athletic competition (internal quotation marks omitted)).

Permitting the government to decree this speech to be a criminal offense, whether shouted from the rooftops or made in a barely audible whisper, would endorse government authority to compile a list of subjects about which false statements are punishable. That governmental power has no clear limiting principle. Our constitutional tradition stands against the idea that we need Oceania's Ministry of Truth. See G. Orwell, Nineteen Eighty-Four (1949) (Centennial ed. 2003). Were this law to be sustained, there could be an endless list of subjects the National Government or the States could single out. Where false claims are made to effect a fraud or secure moneys or other valuable considerations, say offers of employment, it is well established that the Government may restrict speech without affronting the First Amendment. See, *e.g., Virginia Bd. of Pharmacy*, 425 U. S., at 771 (noting that fraudulent speech generally falls outside the protections of the First Amendment). But the Stolen Valor Act is not so limited in its reach. Were the Court to hold that the interest in truthful discourse alone is sufficient to sustain a ban on speech, absent any evidence that the speech was used to gain a material advantage, it would give government a broad censorial power unprecedented in this Court's cases or in our constitutional tradition. The mere potential for the exercise of that power casts a chill, a chill the First Amendment cannot permit if free speech, thought, and discourse are to remain a foundation of our freedom.

### IV

The previous discussion suffices to show that the Act conflicts with free speech principles. But even when examined within its own narrow sphere of operation, the Act cannot survive. In assessing content-based restrictions on protected speech, the Court has not adopted a free-wheeling approach, see *Stevens*, 559 U. S., at ___ (slip op., at 7) ("The First Amendment's guarantee of free speech does not extend only to categories of speech that survive an ad hoc balancing of relative social costs and benefits"), but rather has applied the "most exacting scrutiny." *Turner Broadcasting System, Inc.* v. *FCC*, 512 U. S. 622, 642 (1994). Although the objectives the Government seeks to further by the statute are not without significance, the Court must, and now does, find the Act does not satisfy exacting scrutiny.

The Government is correct when it states military medals "serve the important public function of recognizing and expressing gratitude for acts of heroism and sacrifice in military service," and also "'foste[r] morale, mission accomplishment and esprit de corps' among service members." Brief for United States 37, 38. General George Washington observed that an award for valor would "cherish a virtuous ambition in . . . soldiers, as well as foster and encourage every species of military merit." General Orders of George Washington Issued at Newburgh on the Hudson, 1782–1783 (Aug. 7, 1782), p. 30 (E. Boynton ed. 1883). Time has not diminished this idea. In periods of war and peace alike public recognition of valor and noble sacrifice by men and women in uniform reinforces the pride and national resolve that the military relies upon to fulfill its mission.

These interests are related to the integrity of the military honors system in general, and the Congressional Medal of Honor in particular. Although millions have served with brave resolve, the Medal, which is the highest

military award for valor against an enemy force, has been given just 3,476 times. Established in 1861, the Medal is reserved for those who have distinguished themselves "conspicuously by gallantry and intrepidity at the risk of his life above and beyond the call of duty." 10 U. S. C. §§3741 (Army), 6241 (Navy and Marine Corps), 8741 (Air Force), 14 U. S. C. §491 (Coast Guard). The stories of those who earned the Medal inspire and fascinate, from Dakota Meyer who in 2009 drove five times into the midst of a Taliban ambush to save 36 lives, see Curtis, President Obama Awards Medal of Honor to Dakota Meyer, The White House Blog (Sept. 15, 2011) (all Internet materials as visited June 25, 2012, and available in Clerk of Court's case file); to Desmond Doss who served as an army medic on Okinawa and on June 5, 1945, rescued 75 fellow soldiers, and who, after being wounded, gave up his own place on a stretcher so others could be taken to safety, see America's Heroes 88–90 (J. Willbanks ed. 2011); to William Carney who sustained multiple gunshot wounds to the head, chest, legs, and arm, and yet carried the flag to ensure it did not touch the ground during the Union army's assault on Fort Wagner in July 1863, *id.,* at 44–45. The rare acts of courage the Medal celebrates led President Truman to say he would "rather have that medal round my neck than . . . be president of the United States." Truman Gives No. 1 Army Medal to 15 Heroes, Washington *Post,* Oct. 13, 1945, p. 5. The Government's interest in protecting the integrity of the Medal of Honor is beyond question.

But to recite the Government's compelling interests is not to end the matter. The First Amendment requires that the Government's chosen restriction on the speech at issue be "actually necessary" to achieve its interest. *Entertainment Merchants Assn.,* 564 U. S., at \_\_\_ (slip op., at 12). There must be a direct causal link between the restriction imposed and the injury to be prevented. See *ibid.*

The link between the Government's interest in protecting the integrity of the military honors system and the Act's restriction on the false claims of liars like respondent has not been shown. Although appearing to concede that "an isolated misrepresentation by itself would not tarnish the meaning of military honors," the Government asserts it is "common sense that false representations have the tendency to dilute the value and meaning of military awards," Brief for United States 49, 54. It must be acknowledged that when a pretender claims the Medal to be his own, the lie might harm the Government by demeaning the high purpose of the award, diminishing the honor it confirms, and creating the appearance that the Medal is awarded more often than is true. Furthermore, the lie may offend the true holders of the Medal. From one perspective it insults their bravery and high principles when falsehood puts them in the unworthy company of a pretender.

Yet these interests do not satisfy the Government's heavy burden when it seeks to regulate protected speech. See *United States* v. *Playboy Entertainment Group, Inc.*, 529 U. S. 803, 818 (2000). The Government points to no evidence to support its claim that the public's general perception of military awards is diluted by false claims such as those made by Alvarez. Cf. *Entertainment Merchants Assn., supra,* at ___–___ (slip op., at 12–13) (analyzing and rejecting the findings of research psychologists demonstrating the causal link between violent video games and harmful effects on children). As one of the Government's *amici* notes "there is nothing that charlatans such as Xavier Alvarez can do to stain [the Medal winners'] honor." Brief for Veterans of Foreign Wars of the United States et al. as *Amici Curiae* 1. This general proposition is sound, even if true holders of the Medal might experience anger and frustration.

The lack of a causal link between the Government's stated interest and the Act is not the only way in which

the Act is not actually necessary to achieve the Government's stated interest. The Government has not shown, and cannot show, why counterspeech would not suffice to achieve its interest. The facts of this case indicate that the dynamics of free speech, of counterspeech, of refutation, can overcome the lie. Respondent lied at a public meeting. Even before the FBI began investigating him for his false statements "Alvarez was perceived as a phony," 617 F. 3d, at 1211. Once the lie was made public, he was ridiculed online, see Brief for Respondent 3, his actions were reported in the press, see Ortega, Alvarez Again Denies Claim, Ontario, CA, Inland Valley Daily Bulletin (Sept. 27, 2007), and a fellow board member called for his resignation, see, *e.g.,* Bigham, Water District Rep Requests Alvarez Resign in Wake of False Medal Claim, San Bernardino Cty., CA, The Sun (May 21, 2008). There is good reason to believe that a similar fate would befall other false claimants. See Brief for Reporters Committee for Freedom of the Press et al. as *Amici Curiae* 30–33 (listing numerous examples of public exposure of false claimants). Indeed, the outrage and contempt expressed for respondent's lies can serve to reawaken and reinforce the public's respect for the Medal, its recipients, and its high purpose. The acclaim that recipients of the Congressional Medal of Honor receive also casts doubt on the proposition that the public will be misled by the claims of charlatans or become cynical of those whose heroic deeds earned them the Medal by right. See, *e.g.,* Well Done, Washington *Post,* Feb. 5, 1943, p. 8 (reporting on President Roosevelt's awarding the Congressional Medal of Honor to Maj. Gen. Alexander Vandegrift); Devroy, Medal of Honor Given to 2 Killed in Somalia, Washington *Post,* May 24, 1994, p. A6 (reporting on President Clinton's awarding the Congressional Medal of Honor to two special forces soldiers killed during operations in Somalia).

The remedy for speech that is false is speech that is true. This is the ordinary course in a free society. The

response to the unreasoned is the rational; to the unin-
formed, the enlightened; to the straight-out lie, the simple
truth. See *Whitney* v. *California*, 274 U. S. 357, 377 (1927)
(Brandeis, J., concurring) ("If there be time to expose
through discussion the falsehood and fallacies, to avert
the evil by the processes of education, the remedy to be ap-
plied is more speech, not enforced silence"). The theory of
our Constitution is "that the best test of truth is the power
of the thought to get itself accepted in the competition of
the market," *Abrams* v. *United States*, 250 U. S. 616, 630
(1919) (Holmes, J., dissenting). The First Amendment
itself ensures the right to respond to speech we do not like,
and for good reason. Freedom of speech and thought flows
not from the beneficence of the state but from the inalien-
able rights of the person. And suppression of speech by
the government can make exposure of falsity more diffi-
cult, not less so. Society has the right and civic duty to
engage in open, dynamic, rational discourse. These ends
are not well served when the government seeks to orches-
trate public discussion through content-based mandates.

Expressing its concern that counterspeech is insuf-
ficient, the Government responds that because "some
military records have been lost . . . some claims [are] un-
verifiable," Brief for United States 50. This proves little,
however; for without verifiable records, successful crimi-
nal prosecution under the Act would be more difficult in
any event. So, in cases where public refutation will not
serve the Government's interest, the Act will not either.
In addition, the Government claims that "many [false
claims] will remain unchallenged." *Id.,* at 55. The Gov-
ernment provides no support for the contention. And in
any event, in order to show that public refutation is not an
adequate alternative, the Government must demonstrate
that unchallenged claims undermine the public's percep-
tion of the military and the integrity of its awards system.
This showing has not been made.

It is a fair assumption that any true holders of the Medal who had heard of Alvarez's false claims would have been fully vindicated by the community's expression of outrage, showing as it did the Nation's high regard for the Medal. The same can be said for the Government's interest. The American people do not need the assistance of a government prosecution to express their high regard for the special place that military heroes hold in our tradition. Only a weak society needs government protection or intervention before it pursues its resolve to preserve the truth. Truth needs neither handcuffs nor a badge for its vindication.

In addition, when the Government seeks to regulate protected speech, the restriction must be the "least restrictive means among available, effective alternatives." *Ashcroft*, 542 U. S., at 666. There is, however, at least one less speech-restrictive means by which the Government could likely protect the integrity of the military awards system. A Government-created database could list Congressional Medal of Honor winners. Were a database accessible through the Internet, it would be easy to verify and expose false claims. It appears some private individuals have already created databases similar to this, see Brief for Respondent 25, and at least one database of past winners is online and fully searchable, see Congressional Medal of Honor Society, Full Archive, http://www.cmohs.org/recipient-archive.php. The Solicitor General responds that although Congress and the Department of Defense investigated the feasibility of establishing a database in 2008, the Government "concluded that such a database would be impracticable and insufficiently comprehensive." Brief for United States 55. Without more explanation, it is difficult to assess the Government's claim, especially when at least one database of Congressional Medal of Honor winners already exists.

The Government may have responses to some of these criticisms, but there has been no clear showing of the

necessity of the statute, the necessity required by exacting scrutiny.

*     *     *

The Nation well knows that one of the costs of the First Amendment is that it protects the speech we detest as well as the speech we embrace. Though few might find respondent's statements anything but contemptible, his right to make those statements is protected by the Constitution's guarantee of freedom of speech and expression. The Stolen Valor Act infringes upon speech protected by the First Amendment.

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 11–210

_____

## UNITED STATES, PETITIONER *v.* XAVIER ALVAREZ

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 28, 2012]

JUSTICE BREYER, with whom JUSTICE KAGAN joins, concurring in the judgment.

I agree with the plurality that the Stolen Valor Act of 2005 violates the First Amendment. But I do not rest my conclusion upon a strict categorical analysis. *Ante,* at 4–10. Rather, I base that conclusion upon the fact that the statute works First Amendment harm, while the Government can achieve its legitimate objectives in less restrictive ways.

I

In determining whether a statute violates the First Amendment, this Court has often found it appropriate to examine the fit between statutory ends and means. In doing so, it has examined speech-related harms, justifications, and potential alternatives. In particular, it has taken account of the seriousness of the speech-related harm the provision will likely cause, the nature and importance of the provision's countervailing objectives, the extent to which the provision will tend to achieve those objectives, and whether there are other, less restrictive ways of doing so. Ultimately the Court has had to determine whether the statute works speech-related harm that is out of proportion to its justifications.

Sometimes the Court has referred to this approach as "intermediate scrutiny," sometimes as "proportionality"

review, sometimes as an examination of "fit," and some-
times it has avoided the application of any label at all.
See, *e.g., Turner Broadcasting System, Inc.* v. *FCC*, 512
U. S. 622, 641–652 (1994) (intermediate scrutiny); *Randall*
v. *Sorrell*, 548 U. S. 230, 249 (2006) (plurality opinion)
(proportionality); *Board of Trustees of State Univ. of N. Y.*
v. *Fox*, 492 U. S. 469, 480 (1989) (requiring a "fit" be-
tween means and ends that is "'in proportion to the in-
terest served'"); *In re R. M. J.*, 455 U. S. 191, 203 (1982)
("[I]nterference with speech must be in proportion to the
[substantial governmental] interest served"); *Pickering* v.
*Board of Ed. of Township High School Dist. 205, Will Cty.*,
391 U. S. 563, 568 (1968).

Regardless of the label, some such approach is necessary
if the First Amendment is to offer proper protection in
the many instances in which a statute adversely affects
constitutionally protected interests but warrants neither
near-automatic condemnation (as "strict scrutiny" implies)
nor near-automatic approval (as is implicit in "rational
basis" review).  See, *e.g., Turner Broadcasting System,
Inc.*, *supra*, at 641–652 ("must-carry" cable regulations);
*Central Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n
of N. Y.*, 447 U. S. 557, 566 (1980) (nonmisleading com-
mercial speech); *Burdick* v. *Takushi*, 504 U. S. 428, 433–
434 (1992) (election regulation); *Pickering*, *supra,* at 568
(government employee speech); *United States* v. *O'Brien*,
391 U. S. 367, 377 (1968) (application of generally appli-
cable laws to expressive conduct).  I have used the term
"proportionality" to describe this approach.  *Thompson* v.
*Western States Medical Center*, 535 U. S. 357, 388 (2002)
(dissenting opinion); see also *Bartnicki* v. *Vopper*, 532
U. S. 514, 536 (2001) (concurring opinion); *Nixon* v. *Shrink
Missouri Government PAC*, 528 U. S. 377, 402–403 (2000)
(concurring opinion).  But in this case, the Court's term
"intermediate scrutiny" describes what I think we should
do.

As the dissent points out, "there are broad areas in which any attempt by the state to penalize purportedly false speech would present a grave and unacceptable danger of suppressing truthful speech." *Post,* at 14. Laws restricting false statements about philosophy, religion, history, the social sciences, the arts, and the like raise such concerns, and in many contexts have called for strict scrutiny. But this case does not involve such a law. The dangers of suppressing valuable ideas are lower where, as here, the regulations concern false statements about easily verifiable facts that do not concern such subject matter. Such false factual statements are less likely than are true factual statements to make a valuable contribution to the marketplace of ideas. And the government often has good reasons to prohibit such false speech. See *infra,* at 5–7 (listing examples of statutes and doctrines regulating false factual speech). But its regulation can nonetheless threaten speech-related harms. Those circumstances lead me to apply what the Court has termed "intermediate scrutiny" here.

## II
### A

The Stolen Valor Act makes it a crime "falsely" to "represen[t]" oneself "to have been awarded any decoration or medal authorized by Congress for the Armed Forces of the United States." 18 U. S. C. §704(b). I would read the statute favorably to the Government as criminalizing only false factual statements made with knowledge of their falsity and with the intent that they be taken as true. See *Staples* v. *United States*, 511 U. S. 600, 605 (1994) (courts construe statutes "in light of the background rules of the common law, . . . in which the requirement of some *mens rea* for a crime is firmly embedded"); cf. *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 279–280 (1964) (First Amendment allows a public official to recover for defama-

tion only upon a showing of "'actual malice'"). As so interpreted the statute covers only lies. But although this interpretation diminishes the extent to which the statute endangers First Amendment values, it does not eliminate the threat.

I must concede, as the Government points out, that this Court has frequently said or implied that false factual statements enjoy little First Amendment protection. See, *e.g., BE&K Constr. Co.* v. *NLRB*, 536 U. S. 516, 531 (2002) ("[F]alse statements may be unprotected for their own sake"); *Hustler Magazine, Inc.* v. *Falwell*, 485 U. S. 46, 52 (1988) ("False statements of fact are particularly valueless"); *Gertz* v. *Robert Welch, Inc.*, 418 U. S. 323, 340 (1974) ("[T]he erroneous statement of fact is not worthy of constitutional protection").

But these judicial statements cannot be read to mean "no protection at all." False factual statements can serve useful human objectives, for example: in social contexts, where they may prevent embarrassment, protect privacy, shield a person from prejudice, provide the sick with comfort, or preserve a child's innocence; in public contexts, where they may stop a panic or otherwise preserve calm in the face of danger; and even in technical, philosophical, and scientific contexts, where (as Socrates' methods suggest) examination of a false statement (even if made deliberately to mislead) can promote a form of thought that ultimately helps realize the truth. See, *e.g.,* 638 F. 3d 666, 673–675 (CA9 2011) (Kozinski, J., concurring in denial of rehearing en banc) (providing numerous examples); S. Bok, Lying: Moral Choice in Public and Private Life (1999) (same); *New York Times Co.*, *supra,* at 279, n. 19 ("Even a false statement may be deemed to make a valuable contribution to public debate, since it brings about 'the clearer perception and livelier impression of truth, produced by its collision with error'" (quoting J. Mill, On Liberty 15 (Blackwell ed. 1947))).

Moreover, as the Court has often said, the threat of criminal prosecution for making a false statement can inhibit the speaker from making true statements, thereby "chilling" a kind of speech that lies at the First Amendment's heart. See, *e.g., Gertz, supra,* at 340–341. Hence, the Court emphasizes *mens rea* requirements that provide "breathing room" for more valuable speech by reducing an honest speaker's fear that he may accidentally incur liability for speaking.

Further, the pervasiveness of false statements, made for better or for worse motives, made thoughtlessly or deliberately, made with or without accompanying harm, provides a weapon to a government broadly empowered to prosecute falsity without more. And those who are unpopular may fear that the government will use that weapon selectively, say by prosecuting a pacifist who supports his cause by (falsely) claiming to have been a war hero, while ignoring members of other political groups who might make similar false claims.

I also must concede that many statutes and common-law doctrines make the utterance of certain kinds of false statements unlawful. Those prohibitions, however, tend to be narrower than the statute before us, in that they limit the scope of their application, sometimes by requiring proof of specific harm to identifiable victims; sometimes by specifying that the lies be made in contexts in which a tangible harm to others is especially likely to occur; and sometimes by limiting the prohibited lies to those that are particularly likely to produce harm.

Fraud statutes, for example, typically require proof of a misrepresentation that is material, upon which the victim relied, and which caused actual injury. See Restatement (Second) of Torts §525 (1976). Defamation statutes focus upon statements of a kind that harm the reputation of another or deter third parties from association or dealing with the victim. See *id.,* §§558, 559. Torts involving the

intentional infliction of emotional distress (like torts involving placing a victim in a false light) concern falsehoods that tend to cause harm to a specific victim of an emotional-, dignitary-, or privacy-related kind. See *id.*, §652E.

Perjury statutes prohibit a particular set of false statements—those made under oath—while requiring a showing of materiality. See, *e.g.,* 18 U. S. C. §1621. Statutes forbidding lying to a government official (not under oath) are typically limited to circumstances where a lie is likely to work particular and specific harm by interfering with the functioning of a government department, and those statutes also require a showing of materiality. See, *e.g.,* §1001.

Statutes prohibiting false claims of terrorist attacks, or other lies about the commission of crimes or catastrophes, require proof that substantial public harm be directly foreseeable, or, if not, involve false statements that are very likely to bring about that harm. See, *e.g.,* 47 CFR §73.1217 (2011) (requiring showing of foreseeability and actual substantial harm); 18 U. S. C. §1038(a)(1) (prohibiting knowing false statements claiming that terrorist attacks have taken, are taking, or will take, place).

Statutes forbidding impersonation of a public official typically focus on *acts* of impersonation, not mere speech, and may require a showing that, for example, someone was deceived into following a "course [of action] he would not have pursued but for the deceitful conduct." *United States* v. *Lepowitch*, 318 U. S. 702, 704 (1943); see, *e.g.,* §912 (liability attaches to "[w]hoever falsely assumes or pretends to be an officer or employee acting under the authority of the United States . . . and *acts as such*" (emphasis added)).

Statutes prohibiting trademark infringement present, perhaps, the closest analogy to the present statute. Trademarks identify the source of a good; and infringement causes harm by causing confusion among potential

customers (about the source) and thereby diluting the value of the mark to its owner, to consumers, and to the economy. Similarly, a false claim of possession of a medal or other honor creates confusion about who is entitled to wear it, thus diluting its value to those who have earned it, to their families, and to their country. But trademark statutes are focused upon commercial and promotional activities that are likely to dilute the value of a mark. Indeed, they typically require a showing of likely confusion, a showing that tends to assure that the feared harm will in fact take place. See 15 U. S. C. §1114(1)(a); *KP Permanent Make-Up, Inc.* v. *Lasting Impression I, Inc.*, 543 U. S. 111, 117 (2004); see also *San Francisco Arts & Athletics, Inc.* v. *United States Olympic Comm.*, 483 U. S. 522, 539–540, 548 (1987) (upholding statute giving the United States Olympic Committee the right to prohibit certain *commercial and promotional uses* of the word "Olympic").

While this list is not exhaustive, it is sufficient to show that few statutes, if any, simply prohibit without limitation the telling of a lie, even a lie about one particular matter. Instead, in virtually all these instances limitations of context, requirements of proof of injury, and the like, narrow the statute to a subset of lies where specific harm is more likely to occur. The limitations help to make certain that the statute does not allow its threat of liability or criminal punishment to roam at large, discouraging or forbidding the telling of the lie in contexts where harm is unlikely or the need for the prohibition is small.

The statute before us lacks any such limiting features. It may be construed to prohibit only knowing and intentional acts of deception about readily verifiable facts within the personal knowledge of the speaker, thus reducing the risk that valuable speech is chilled. *Supra,* at 3–4. But it still ranges very broadly. And that breadth means that it creates a significant risk of First Amendment

harm. As written, it applies in family, social, or other private contexts, where lies will often cause little harm. It also applies in political contexts, where although such lies are more likely to cause harm, the risk of censorious selectivity by prosecutors is also high. Further, given the potential haziness of individual memory along with the large number of military awards covered (ranging from medals for rifle marksmanship to the Congressional Medal of Honor), there remains a risk of chilling that is not completely eliminated by *mens rea* requirements; a speaker might still be worried about being *prosecuted* for a careless false statement, even if he does not have the intent required to render him liable. And so the prohibition may be applied where it should not be applied, for example, to bar stool braggadocio or, in the political arena, subtly but selectively to speakers that the Government does not like. These considerations lead me to believe that the statute as written risks significant First Amendment harm.

## B

Like both the plurality and the dissent, I believe the statute nonetheless has substantial justification. It seeks to protect the interests of those who have sacrificed their health and life for their country. The statute serves this interest by seeking to preserve intact the country's recognition of that sacrifice in the form of military honors. To permit those who have not earned those honors to claim otherwise dilutes the value of the awards. Indeed, the Nation cannot fully honor those who have sacrificed so much for their country's honor unless those who claim to have received its military awards tell the truth. Thus, the statute risks harming protected interests but only in order to achieve a substantial countervailing objective.

## C

We must therefore ask whether it is possible substan-

tially to achieve the Government's objective in less burdensome ways. In my view, the answer to this question is "yes." Some potential First Amendment threats can be alleviated by interpreting the statute to require knowledge of falsity, etc. *Supra,* at 3–4. But other First Amendment risks, primarily risks flowing from breadth of coverage, remain. *Supra,* at 4–5, 7–8. As is indicated by the limitations on the scope of the many other kinds of statutes regulating false factual speech, *supra,* at 5–7, it should be possible significantly to diminish or eliminate these remaining risks by enacting a similar but more finely tailored statute. For example, not all military awards are alike. Congress might determine that some warrant greater protection than others. And a more finely tailored statute might, as other kinds of statutes prohibiting false factual statements have done, insist upon a showing that the false statement caused specific harm or at least was material, or focus its coverage on lies most likely to be harmful or on contexts where such lies are most likely to cause harm.

I recognize that in some contexts, particularly political contexts, such a narrowing will not always be easy to achieve. In the political arena a false statement is more likely to make a behavioral difference (say, by leading the listeners to vote for the speaker) but at the same time criminal prosecution is particularly dangerous (say, by radically changing a potential election result) and consequently can more easily result in censorship of speakers and their ideas. Thus, the statute may have to be significantly narrowed in its applications. Some lower courts have upheld the constitutionality of roughly comparable but narrowly tailored statutes in political contexts. See, *e.g., United We Stand America, Inc.* v. *United We Stand, America New York, Inc.*, 128 F. 3d 86, 93 (CA2 1997) (upholding against First Amendment challenge application of Lanham Act to a political organization); *Treasure of*

*the Committee to Elect Gerald D. Lostracco* v. *Fox*, 150 Mich. App. 617, 389 N. W. 2d 446 (1986) (upholding under First Amendment statute prohibiting campaign material falsely claiming that one is an incumbent). Without expressing any view on the validity of those cases, I would also note, like the plurality, that in this area more accurate information will normally counteract the lie. And an accurate, publicly available register of military awards, easily obtainable by political opponents, may well adequately protect the integrity of an award against those who would falsely claim to have earned it. See *ante,* at 17–18. And so it is likely that a more narrowly tailored statute combined with such information-disseminating devices will effectively serve Congress' end.

The Government has provided no convincing explanation as to why a more finely tailored statute would not work. In my own view, such a statute could significantly reduce the threat of First Amendment harm while permitting the statute to achieve its important protective objective. That being so, I find the statute as presently drafted works disproportionate constitutional harm. It consequently fails intermediate scrutiny, and so violates the First Amendment.

For these reasons, I concur in the Court's judgment.

# SUPREME COURT OF THE UNITED STATES

_____

No. 11–210

_____

## UNITED STATES, PETITIONER *v.* XAVIER ALVAREZ

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 28, 2012]

JUSTICE ALITO, with whom JUSTICE SCALIA and JUS-
TICE THOMAS join, dissenting.

Only the bravest of the brave are awarded the Congres-
sional Medal of Honor, but the Court today holds that
every American has a constitutional right to claim to have
received this singular award. The Court strikes down the
Stolen Valor Act of 2005, which was enacted to stem an
epidemic of false claims about military decorations. These
lies, Congress reasonably concluded, were undermining
our country's system of military honors and inflicting real
harm on actual medal recipients and their families.

Building on earlier efforts to protect the military awards
system, Congress responded to this problem by crafting a
narrow statute that presents no threat to the freedom of
speech. The statute reaches only knowingly false state-
ments about hard facts directly within a speaker's per-
sonal knowledge. These lies have no value in and of
themselves, and proscribing them does not chill any
valuable speech.

By holding that the First Amendment nevertheless
shields these lies, the Court breaks sharply from a long
line of cases recognizing that the right to free speech does
not protect false factual statements that inflict real harm
and serve no legitimate interest. I would adhere to that
principle and would thus uphold the constitutionality of
this valuable law.

## I

The Stolen Valor Act makes it a misdemeanor to "falsely represen[t]" oneself as having been awarded a medal, decoration, or badge for service in the Armed Forces of the United States. 18 U. S. C. §704(b). Properly construed, this statute is limited in five significant respects. First, the Act applies to only a narrow category of false representations about objective facts that can almost always be proved or disproved with near certainty. Second, the Act concerns facts that are squarely within the speaker's personal knowledge. Third, as the Government maintains, see Brief for United States 15–17, and both the plurality, see *ante,* at 7, and the concurrence, see *ante,* at 3 (BREYER, J., concurring in judgment), seemingly accept, a conviction under the Act requires proof beyond a reasonable doubt that the speaker actually knew that the representation was false.[1] Fourth, the Act applies only to statements that could reasonably be interpreted as communicating actual facts; it does not reach dramatic performances, satire, parody, hyperbole, or the like.[2] Finally,

———————

[1] Although the Act does not use the term "knowing" or "knowingly," we have explained that criminal statutes must be construed "in light of the background rules of the common law . . . in which the requirement of some *mens rea* for a crime is firmly embedded." *Staples* v. *United States*, 511 U. S. 600, 605 (1994). The Act's use of the phrase "falsely represents," moreover, connotes a knowledge requirement. See Black's Law Dictionary 1022 (8th ed. 2004) (defining a "misrepresentation" or "false representation" to mean "[t]he act of making a false or misleading assertion about something, usu. with the *intent to deceive*" (emphasis added)).

[2] See Black's Law Dictionary, *supra*, at 1327 (defining "representation" to mean a "presentation of fact"); see also *Milkovich* v. *Lorain Journal Co.*, 497 U. S. 1, 20 (1990) (explaining that the Court has protected "statements that cannot 'reasonably [be] interpreted as stating actual facts' about an individual" so that "public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation" (quoting *Hustler Magazine, Inc.* v. *Falwell*, 485 U. S. 46, 50 (1988); alteration in original)).

the Act is strictly viewpoint neutral. The false statements proscribed by the Act are highly unlikely to be tied to any particular political or ideological message. In the rare cases where that is not so, the Act applies equally to all false statements, whether they tend to disparage or commend the Government, the military, or the system of military honors.

The Stolen Valor Act follows a long tradition of efforts to protect our country's system of military honors. When George Washington, as the commander of the Continental Army, created the very first "honorary badges of distinction" for service in our country's military, he established a rigorous system to ensure that these awards would be received and worn by only the truly deserving. See General Orders of George Washington Issued at Newburgh on the Hudson, 1782–1783, p. 35 (E. Boynton ed. 1883) (reprint 1973) (requiring the submission of "incontestible proof" of "singularly meritorious action" to the Commander in Chief). Washington warned that anyone with the "insolence to assume" a badge that had not actually been earned would be "severely punished." *Id.*, at 34.

Building on this tradition, Congress long ago made it a federal offense for anyone to wear, manufacture, or sell certain military decorations without authorization. See Act of Feb. 24, 1923, ch. 110, 42 Stat. 1286 (codified as amended at 18 U. S. C. §704(a)). Although this Court has never opined on the constitutionality of that particular provision, we have said that §702, which makes it a crime to wear a United States military uniform without authorization, is "a valid statute on its face." *Schacht* v. *United States*, 398 U. S. 58, 61 (1970).

Congress passed the Stolen Valor Act in response to a proliferation of false claims concerning the receipt of military awards. For example, in a single year, *more than 600* Virginia residents falsely claimed to have won the

Medal of Honor.[3]  An investigation of the 333 people listed in the online edition of Who's Who as having received a top military award revealed that fully a third of the claims could not be substantiated.[4]  When the Library of Congress compiled oral histories for its Veterans History Project, 24 of the 49 individuals who identified themselves as Medal of Honor recipients had not actually received that award.[5]  The same was true of 32 individuals who claimed to have been awarded the Distinguished Service Cross and 14 who claimed to have won the Navy Cross.[6] Notorious cases brought to Congress' attention included the case of a judge who falsely claimed to have been awarded *two* Medals of Honor and displayed counterfeit medals in his courtroom;[7] a television network's military consultant who falsely claimed that he had received the Silver Star;[8] and a former judge advocate in the Marine Corps who lied about receiving the Bronze Star and a Purple Heart.[9]

—————————

[3] Colimore, Pinning Crime on Fake Heroes: N. J. Agent Helps Expose and Convict Those with Bogus U. S. Medals, Philadelphia Inquirer, Feb. 11, 2004, http://articles.philly.com/2004-02-11/news/25374213_1_ medals-military-imposters-distinguished-flying-cross (all Internet materials as visited June 25, 2012, and available in Clerk of Court's case file).

[4] Crewdson, Claims of Medals Amount to Stolen Valor, Chicago Tribune, Oct. 26, 2008, http://www.chicagotribune.com/news/local/chi-valor-oct25,0,4301227.story?page=1.

[5] Half of MOH Entries in Oral History Project Are Incorrect, Marine Corps Times, Oct. 1, 2007, 2007 WLNR 27917486.

[6] *Ibid.*

[7] Young, His Honor Didn't Get Medal of Honor, Chicago Tribune, Oct. 21, 1994, http://articles.chicagotribune.com/1994-10-21/news/9410210318_1_congressional-medal-highest-fritz.

[8] Rutenberg, At Fox News, the Colonel Who Wasn't, N. Y. Times, Apr. 29, 2002, http://www.nytimes.com/2002/04/29/business/at-fox-news-the-colonel-who-wasn-t.html?pagewanted=all&src=pm.

[9] B. Burkett & G. Whitley, Stolen Valor: How the Vietnam Generation Was Robbed of Its Heroes and Its History 179 (1998).

As Congress recognized, the lies proscribed by the Stolen Valor Act inflict substantial harm. In many instances, the harm is tangible in nature: Individuals often falsely represent themselves as award recipients in order to obtain financial or other material rewards, such as lucrative contracts and government benefits.[10] An investigation of false claims in a single region of the United States, for example, revealed that 12 men had defrauded the Department of Veterans Affairs out of more than $1.4 million in veteran's benefits.[11] In other cases, the harm is less tangible, but nonetheless significant. The lies proscribed by the Stolen Valor Act tend to debase the distinctive honor of military awards. See Stolen Valor Act of 2005, §2, 120 Stat. 3266, note following 18 U. S. C. §704 (finding that "[f]raudulent claims surrounding the receipt of [military decorations and medals] damage the reputation and meaning of such decorations and medals"). And legitimate award recipients and their families have expressed the harm they endure when an imposter takes credit for heroic actions that he never performed. One Medal of Honor recipient described the feeling as a "'slap in the face of veterans who have paid the price and earned their medals.'"[12]

It is well recognized in trademark law that the proliferation of cheap imitations of luxury goods blurs the "'signal'

―――――――――

[10] Indeed, the first person to be prosecuted under the Stolen Valor Act apparently "parlayed his medals into lucrative security consulting contracts." Zambito, War Crime: FBI Targets Fake Heroes, New York Daily News, May 6, 2007, http://www.nydailynews.com/news/crime/war-crime-fbi-targets-fake-heroes-article-1.249168.

[11] Dept. of Justice, Northwest Crackdown on Fake Veterans in "Operation Stolen Valor," Sept. 21, 2007, http://www.justice.gov/usao/waw/press/2007/sep/operationstolenvalor.html.

[12] Cato, High Court Tussles With False Heroics: Free Speech or Felony? Pittsburg Tribune Review, Feb. 23, 2012, http://triblive.com/usworld/nation/1034434-85/court-military-law-false-medals-supreme-valor-act-federal-free.

given out by the purchasers of the originals." Landes & Posner, Trademark Law: An Economic Perspective, 30 J. Law & Econ. 265, 308 (1987). In much the same way, the proliferation of false claims about military awards blurs the signal given out by the actual awards by making them seem more common than they really are, and this diluting effect harms the military by hampering its efforts to foster morale and esprit de corps. Surely it was reasonable for Congress to conclude that the goal of preserving the integrity of our country's top military honors is at least as worthy as that of protecting the prestige associated with fancy watches and designer handbags. Cf. *San Francisco Arts & Athletics, Inc.* v. *United States Olympic Comm.*, 483 U. S. 522, 539–541 (1987) (rejecting First Amendment challenge to law prohibiting certain unauthorized uses of the word "Olympic" and recognizing that such uses harm the U. S. Olympic Committee by "lessening the distinctiveness" of the term).

Both the plurality and JUSTICE BREYER argue that Congress could have preserved the integrity of military honors by means other than a criminal prohibition, but Congress had ample reason to believe that alternative approaches would not be adequate. The chief alternative that is recommended is the compilation and release of a comprehensive list or database of actual medal recipients. If the public could readily access such a resource, it is argued, imposters would be quickly and easily exposed, and the proliferation of lies about military honors would come to an end.

This remedy, unfortunately, will not work. The Department of Defense has explained that the most that it can do is to create a database of recipients of certain top military honors awarded since 2001. See Office of Undersecretary of Defense, Report to the Senate and House Armed Services Committees on a Searchable Military

Valor Decorations Database 4–5 (2009).[13]

Because a sufficiently comprehensive database is not practicable, lies about military awards cannot be remedied by what the plurality calls "counterspeech." *Ante,* at 15. Without the requisite database, many efforts to refute false claims may be thwarted, and some legitimate award recipients may be erroneously attacked. In addition, a steady stream of stories in the media about the exposure of imposters would tend to increase skepticism among members of the public about the entire awards system. This would only exacerbate the harm that the Stolen Valor Act is meant to prevent.

The plurality and the concurrence also suggest that Congress could protect the system of military honors by enacting a narrower statute. The plurality recommends a law that would apply only to lies that are intended to "secure moneys or other valuable considerations." *Ante*, at 11. In a similar vein, the concurrence comments that "a more finely tailored statute might . . . insist upon a showing that the false statement caused specific harm." *Ante,* at 9 (opinion of BREYER, J.). But much damage is caused, both to real award recipients and to the system of military honors, by false statements that are not linked to any financial or other tangible reward. Unless even a small financial loss—say, a dollar given to a homeless man falsely claiming to be a decorated veteran—is more important in the eyes of the First Amendment than the damage caused to the very integrity of the military awards system, there is no basis for distinguishing between the Stolen Valor Act and the alternative statutes that the plurality and concurrence appear willing to sustain.

——————

[13] In addition, since the Department may not disclose the Social Security numbers or birthdates of recipients, this database would be of limited use in ascertaining the veracity of a claim involving a person with a common name. Office of Undersecretary of Defense, Report, at 3–4.

JUSTICE BREYER also proposes narrowing the statute so that it covers a shorter list of military awards, *ante,* at 9 (opinion concurring in judgment), but he does not provide a hint about where he thinks the line must be drawn. Perhaps he expects Congress to keep trying until it eventually passes a law that draws the line in just the right place.

## II

### A

Time and again, this Court has recognized that as a general matter false factual statements possess no intrinsic First Amendment value. See *Illinois ex rel. Madigan* v. *Telemarketing Associates, Inc.*, 538 U. S. 600, 612 (2003) ("Like other forms of public deception, fraudulent charitable solicitation is unprotected speech"); *BE&K Constr. Co.* v. *NLRB*, 536 U. S. 516, 531 (2002) ("[F]alse statements may be unprotected for their own sake"); *Hustler Magazine, Inc.* v. *Falwell*, 485 U. S. 46, 52 (1988) ("False statements of fact are particularly valueless; they interfere with the truth-seeking function of the marketplace of ideas, and they cause damage to an individual's reputation that cannot easily be repaired by counterspeech, however persuasive or effective"); *Keeton* v. *Hustler Magazine, Inc.*, 465 U. S. 770, 776 (1984) ("There is 'no constitutional value in false statements of fact'" (quoting *Gertz* v. *Robert Welch, Inc.*, 418 U. S. 323, 340 (1974))); *Bill Johnson's Restaurants, Inc.* v. *NLRB*, 461 U. S. 731, 743 (1983) ("[F]alse statements are not immunized by the First Amendment right to freedom of speech"); *Brown* v. *Hartlage*, 456 U. S. 45, 60 (1982) ("Of course, demonstrable falsehoods are not protected by the First Amendment in the same manner as truthful statements"); *Herbert* v. *Lando*, 441 U. S. 153, 171 (1979) ("Spreading false information in and of itself carries no First Amendment credentials"); *Virginia Bd. of Pharmacy* v. *Virginia Citizens*

*Consumer Council, Inc.*, 425 U. S. 748, 771 (1976) ("Untruthful speech, commercial or otherwise, has never been protected for its own sake"); *Gertz, supra,* at 340 ("[T]he erroneous statement of fact is not worthy of constitutional protection"); *Time, Inc.* v. *Hill*, 385 U. S. 374, 389 (1967) ("[T]he constitutional guarantees [of the First Amendment] can tolerate sanctions against *calculated* falsehood without significant impairment of their essential function"); *Garrison* v. *Louisiana*, 379 U. S. 64, 75 (1964) ("[T]he knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection").

Consistent with this recognition, many kinds of false factual statements have long been proscribed without "'rais[ing] any Constitutional problem.'" *United States* v. *Stevens*, 559 U. S. \_\_\_, \_\_\_ (2010) (slip op., at 6) (quoting *Chaplinsky* v. *New Hampshire*, 315 U. S. 568, 571–572 (1942)). Laws prohibiting fraud, perjury, and defamation, for example, were in existence when the First Amendment was adopted, and their constitutionality is now beyond question. See, *e.g., Donaldson* v. *Read Magazine, Inc.*, 333 U. S. 178, 190 (1948) (explaining that the government's power "to protect people against fraud" has "always been recognized in this country and is firmly established"); *United States* v. *Dunnigan*, 507 U. S. 87, 97 (1993) (observing that "the constitutionality of perjury statutes is unquestioned"); *Beauharnais* v. *Illinois*, 343 U. S. 250, 256 (1952) (noting that the "prevention and punishment" of libel "have never been thought to raise any Constitutional problem").

We have also described as falling outside the First Amendment's protective shield certain false factual statements that were neither illegal nor tortious at the time of the Amendment's adoption. The right to freedom of speech has been held to permit recovery for the intentional infliction of emotional distress by means of a false state-

ment, see *Falwell*, *supra,* at 56, even though that tort did
not enter our law until the late 19th century, see W. Keeton,
D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton
on Law of Torts §12, p. 60, and n. 47. (5th ed. 1984) (here-
inafter Prosser and Keeton).  And in *Hill*, *supra,* at 390,
the Court concluded that the free speech right allows
recovery for the even more modern tort of false-light inva-
sion of privacy, see Prosser and Keeton §117, at 863.

In line with these holdings, it has long been assumed
that the First Amendment is not offended by prominent
criminal statutes with no close common-law analog.  The
most well known of these is probably 18 U. S. C. §1001,
which makes it a crime to "knowingly and willfully" make
any "materially false, fictitious, or fraudulent statement or
representation" in "any matter within the jurisdiction of
the executive, legislative, or judicial branch of the Gov-
ernment of the United States."  Unlike perjury, §1001
is not limited to statements made under oath or before
an official government tribunal.  Nor does it require any
showing of "pecuniary or property loss to the government."
*United States* v. *Gilliland*, 312 U. S. 86, 93 (1941).  In-
stead, the statute is based on the need to protect "agencies
from the perversion which *might* result from the deceptive
practices described."  *Ibid.* (emphasis added).

Still other statutes make it a crime to falsely represent
that one is speaking on behalf of, or with the approval of,
the Federal Government.  See, *e.g.,* 18 U. S. C. §912 (mak-
ing it a crime to falsely impersonate a federal officer); §709
(making it a crime to knowingly use, without authoriza-
tion, the names of enumerated federal agencies, such as
"Federal Bureau of Investigation," in a manner reasonably
calculated to convey the impression that a communication
is approved or authorized by the agency).  We have recog-
nized that §912, like §1001, does not require a showing of
pecuniary or property loss and that its purpose is to
"'maintain the general good repute and dignity'" of Gov-

ernment service. *United States* v. *Lepowitch*, 318 U. S. 702, 704 (1943) (quoting *United States* v. *Barnow*, 239 U. S. 74, 80 (1915)). All told, there are more than 100 federal criminal statutes that punish false statements made in connection with areas of federal agency concern. See *United States* v. *Wells*, 519 U. S. 482, 505–507, and nn. 8–10 (1997) (Stevens, J., dissenting) (citing "at least 100 federal false statement statutes" in the United States Code).

These examples amply demonstrate that false statements of fact merit no First Amendment protection in their own right.[14] It is true, as JUSTICE BREYER notes,

---

[14]The plurality rejects this rule. Although we have made clear that "[u]ntruthful speech . . . has never been protected for its own sake," *Virginia Bd. of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748, 771 (1976), the most the plurality is willing to concede is that "the falsity of speech bears upon whether it is protected," *ante,* at 9. This represents a dramatic—and entirely unjustified—departure from the sound approach taken in past cases.

Respondent and his supporting *amici* attempt to limit this rule to certain subsets of false statements, see, *e.g.,* Brief for Respondent 53 (asserting that, at most, only falsity that is proved to cause specific harm is stripped of its First Amendment protection), but the examples described above belie that attempt. These examples show that the rule at least applies to (1) specific types of false statements that were neither illegal nor tortious in 1791 (the torts of intentional infliction of emotional distress and false-light invasion of privacy did not exist when the First Amendment was adopted); (2) false speech that does not cause pecuniary harm (the harm remedied by the torts of defamation, intentional infliction of emotional distress, and false-light invasion of privacy is often nonpecuniary in nature, as is the harm inflicted by statements that are illegal under §§912 and 1001); (3) false speech that does not cause detrimental reliance (neither perjury laws nor many of the federal false statement statutes require that anyone actually rely on the false statement); (4) particular false statements that are not shown in court to have caused specific harm (damages can be presumed in defamation actions involving knowing or reckless falsehoods, and no showing of specific harm is required in prosecutions under many of the federal false statement statutes); and (5) false speech that does not cause harm to a specific individual (the purpose of many of the federal

that many in our society either approve or condone certain discrete categories of false statements, including false statements made to prevent harm to innocent victims and so-called "white lies." See *ante*, at 4. But respondent's false claim to have received the Medal of Honor did not fall into any of these categories. His lie did not "prevent embarrassment, protect privacy, shield a person from prejudice, provide the sick with comfort, or preserve a child's innocence." *Ibid.* Nor did his lie "stop a panic or otherwise preserve calm in the face of danger" or further philosophical or scientific debate. *Ibid.* Respondent's claim, like all those covered by the Stolen Valor Act, served no valid purpose.

Respondent and others who join him in attacking the Stolen Valor Act take a different view. Respondent's brief features a veritable paean to lying. According to respondent, his lie about the Medal of Honor was nothing out of the ordinary for 21st-century Americans. "Everyone lies," he says. Brief for Respondent 10. "We lie all the time." *Ibid.* "[H]uman beings are constantly forced to choose the persona we present to the world, and our choices nearly always involve intentional omissions and misrepresentations, if not outright deception." *Id.,* at 39. An academic *amicus* tells us that the First Amendment protects the right to construct "self-aggrandizing fabrications such as having been awarded a military decoration." Brief for Jonathan D. Varat as *Amicus Curiae* 5.

This radical interpretation of the First Amendment is not supported by any precedent of this Court. The lies covered by the Stolen Valor Act have no intrinsic value and thus merit no First Amendment protection unless their prohibition would chill other expression that falls within the Amendment's scope. I now turn to that question.

_____

false statement statutes is to protect government processes).

### B

While we have repeatedly endorsed the principle that false statements of fact do not merit First Amendment protection for their own sake, we have recognized that it is sometimes necessary to "exten[d] a measure of strategic protection" to these statements in order to ensure sufficient "'breathing space'" for protected speech. *Gertz*, 418 U. S., at 342 (quoting *NAACP* v. *Button*, 371 U. S. 415, 433 (1963)). Thus, in order to prevent the chilling of truthful speech on matters of public concern, we have held that liability for the defamation of a public official or figure requires proof that defamatory statements were made with knowledge or reckless disregard of their falsity. See *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 279–280 (1964) (civil liability); *Garrison*, 379 U. S., at 74–75 (criminal liability). This same requirement applies when public officials and figures seek to recover for the tort of intentional infliction of emotional distress. See *Falwell*, 485 U. S., at 55–56. And we have imposed "[e]xacting proof requirements" in other contexts as well when necessary to ensure that truthful speech is not chilled. *Madigan*, 538 U. S., at 620 (complainant in a fraud action must show that the defendant made a knowingly false statement of material fact with the intent to mislead the listener and that he succeeded in doing so); see also *BE&K Constr.*, 536 U. S., at 531 (regulation of baseless lawsuits limited to those that are both "objectively baseless *and* subjectively motivated by an unlawful purpose"); *Hartlage*, 456 U. S., at 61 (sustaining as-applied First Amendment challenge to law prohibiting certain "factual misstatements in the course of political debate" where there had been no showing that the disputed statement was made "other than in good faith and without knowledge of its falsity, or . . . with reckless disregard as to whether it was false or not"). All of these proof requirements inevitably have the effect of

bringing some false factual statements within the protection of the First Amendment, but this is justified in order to prevent the chilling of other, valuable speech.

These examples by no means exhaust the circumstances in which false factual statements enjoy a degree of instrumental constitutional protection. On the contrary, there are broad areas in which any attempt by the state to penalize purportedly false speech would present a grave and unacceptable danger of suppressing truthful speech. Laws restricting false statements about philosophy, religion, history, the social sciences, the arts, and other matters of public concern would present such a threat. The point is not that there is no such thing as truth or falsity in these areas or that the truth is always impossible to ascertain, but rather that it is perilous to permit the state to be the arbiter of truth.

Even where there is a wide scholarly consensus concerning a particular matter, the truth is served by allowing that consensus to be challenged without fear of reprisal. Today's accepted wisdom sometimes turns out to be mistaken. And in these contexts, "[e]ven a false statement may be deemed to make a valuable contribution to public debate, since it brings about 'the clearer perception and livelier impression of truth, produced by its collision with error.'" *Sullivan, supra*, at 279, n. 19 (quoting J. Mill, On Liberty 15 (R. McCallum ed. 1947)).

Allowing the state to proscribe false statements in these areas also opens the door for the state to use its power for political ends. Statements about history illustrate this point. If some false statements about historical events may be banned, how certain must it be that a statement is false before the ban may be upheld? And who should make that calculation? While our cases prohibiting viewpoint discrimination would fetter the state's power to some degree, see *R. A. V.* v. *St. Paul*, 505 U. S. 377, 384–390 (1992) (explaining that the First Amendment does not

permit the government to engage in viewpoint discrimination under the guise of regulating unprotected speech), the potential for abuse of power in these areas is simply too great.

In stark contrast to hypothetical laws prohibiting false statements about history, science, and similar matters, the Stolen Valor Act presents no risk at all that valuable speech will be suppressed. The speech punished by the Act is not only verifiably false and entirely lacking in intrinsic value, but it also fails to serve any instrumental purpose that the First Amendment might protect. Tellingly, when asked at oral argument what truthful speech the Stolen Valor Act might chill, even respondent's counsel conceded that the answer is none. Tr. of Oral Arg. 36.

C

Neither of the two opinions endorsed by Justices in the majority claims that the false statements covered by the Stolen Valor Act possess either intrinsic or instrumental value. Instead, those opinions appear to be based on the distinct concern that the Act suffers from overbreadth. See *ante,* at 10 (plurality opinion) (the Act applies to "personal, whispered conversations within a home"); *ante,* at 8 (BREYER, J., concurring in judgment) (the Act "applies in family, social, or other private contexts" and in "political contexts"). But to strike down a statute on the basis that it is overbroad, it is necessary to show that the statute's "overbreadth [is] *substantial*, not only in an absolute sense, but also relative to [its] plainly legitimate sweep." *United States* v. *Williams*, 553 U. S. 285, 292 (2008); see also *ibid.* (noting that this requirement has been "vigorously enforced"). The plurality and the concurrence do not even attempt to make this showing.

The plurality additionally worries that a decision sustaining the Stolen Valor Act might prompt Congress and the state legislatures to enact laws criminalizing lies

about "an endless list of subjects." *Ante,* at 11.  The plu-
rality apparently fears that we will see laws making it a
crime to lie about civilian awards such as college degrees
or certificates of achievement in the arts and sports.

This concern is likely unfounded.  With very good rea-
son, military honors have traditionally been regarded as
quite different from civilian awards.  Nearly a century ago,
Congress made it a crime to wear a military medal with-
out authorization; we have no comparable tradition re-
garding such things as Super Bowl rings, Oscars, or Phi
Beta Kappa keys.

In any event, if the plurality's concern is not entirely
fanciful, it falls outside the purview of the First Amend-
ment.  The problem that the plurality foresees—that
legislative bodies will enact unnecessary and overly intru-
sive criminal laws—applies regardless of whether the laws
in question involve speech or nonexpressive conduct.  If
there is a problem with, let us say, a law making it a
criminal offense to falsely claim to have been a high school
valedictorian, the problem is not the suppression of speech
but the misuse of the criminal law, which should be re-
served for conduct that inflicts or threatens truly serious
societal harm.  The objection to this hypothetical law
would be the same as the objection to a law making it a
crime to eat potato chips during the graduation ceremony
at which the high school valedictorian is recognized.  The
safeguard against such laws is democracy, not the First
Amendment.  Not every foolish law is unconstitutional.

The Stolen Valor Act represents the judgment of the
people's elected representatives that false statements
about military awards are very different from false state-
ments about civilian awards.  Certainly this is true with
respect to the high honor that respondent misappropri-
ated.  Respondent claimed that he was awarded the Medal of
Honor in 1987 for bravery during the Iran hostage crisis.
This singular award, however, is bestowed only on those

members of the Armed Forces who "distinguis[h] [them-selves] conspicuously by gallantry and intrepidity at the risk of [their lives] above and beyond the call of duty." 10 U. S. C. §3741; see also §§6241, 8741. More than half of the heroic individuals to have been awarded the Medal of Honor after World War I received it posthumously.[15] Congress was entitled to conclude that falsely claiming to have won the Medal of Honor is qualitatively different from even the most prestigious civilian awards and that the misappropriation of that honor warrants criminal sanction.

\*     \*     \*

The Stolen Valor Act is a narrow law enacted to address an important problem, and it presents no threat to free-dom of expression. I would sustain the constitutionality of the Act, and I therefore respectfully dissent.

———————

[15] See U. S. Army Center of Military History, Medal of Honor Statis-tics, http://www.history.army.mil/html/moh/mohstats.html.