Opinion by Judge IKUTA; Dissent by Judge BYBEE.
OPINION
IKUTA, Circuit Judge:
This appeal requires us to determine whether the reasoning in United States v. Alvarez, — U.S. —, 132 S.Ct. 2537, 183 L.Ed.2d 574 (2012), which invalidated a statute prohibiting lying about being awarded military medals, see 18 U.S.C. § 704(b) (2011 ed.),[1] also applies to a stat *304 ute criminalizing the unauthorized wearing of such medals, see 18 U.S.C. § 704(a) (2006 ed.).[2] We hold that it does, and therefore reverse the district court.[3]
I
Defendant Elven Joe Swisher enlisted in the United States Marine Corps on August 4, 1954, a little over a year after the Korean War ended. In August 1957, he was honorably discharged from the Marine Corps into the reserves. Upon discharge, Swisher was given a DD-214 discharge document, a typewritten form that provided his name, education, type of discharge, last duty assignment, last date of service, and similar information regarding his military service. The form required a listing of Swisher’s “decorations, medals, badges, commendations, citations and campaign ribbons awarded or authorized.” In the authenticated copy of Swisher’s original DD-214, the term “N/A” (not applicable) is written in the field.
In 2001, more than forty years after his discharge, Swisher filed a claim for service-related Post-Traumatic Stress Disorder (PTSD). In his application, Swisher claimed he suffered from PTSD as a result of his participation in a secret combat mission in North Korea in August or September 1955. Along with his application, Swisher provided a self-published narrative that described the North Korea operation. According to the narrative, Swisher was wounded in battle, and subsequently presented with a Purple Heart by an unnamed captain who visited him in the hospital. The same captain told him he was “entitled to and should wear the National Defense Medal, Korean War Service Medal and the Korean War U.N. Service Medal and Ribbons.” Swisher claims he also received a Silver Star and a Navy Commendation Medal and Ribbon, with a Bronze “V.”
After reviewing Swisher’s application for PTSD benefits and the accompanying narrative, the VA denied the claim because *305 Swisher failed to provide corroborating evidence beyond his own statement that his PTSD was service connected.
Swisher appealed the denial and submitted a photocopy of a second DD-214, which included the typewritten comment that “[t]his document replaces the previously issued transfer document” and “[c]hanges and additions have been verified by Command.” The new form stated that Swisher had received the Silver Star, Navy and Marine Corps Medal with Gold Star, Purple Heart, and Navy and Marine Corps Commendation Medal with Bronze “V.” Based on this information, the VA reversed its previous decision in July 2004, ruled that Swisher’s PTSD was a compen-sable disability, and granted Swisher a total of $2,366 a month in benefits.[4]
About a year later, the VA received information from the military personnel division that the replacement DD-214 was fraudulent. In July 2006, after further investigation confirmed that the DD-214 was forged, the VA reversed its determination that the PTSD was service connected and required Swisher to pay back the PTSD benefits that he had received.
In July 2007, a grand jury indicted Swisher for four violations of federal law: (1) wearing unauthorized military medals in violation of 18 U.S.C. § 704(a); (2) making false statements to the VA regarding his military service, disabilities, and honors, in an effort to obtain benefits in violation of 18 U.S.C. § 1001(a)(2); (3) forging or altering his certificate of discharge, also in an effort to obtain benefits, in violation of 18 U.S.C. § 1001(a)(3); and (4) theft of government funds, in violation of 18 U.S.C. § 641.
During the one-week trial, Lieutenant Colonel Elaine Hensen, the assistant head for the Military Awards Branch at Headquarters Marine Corps, discussed her review of the Marine Corps files and her determination that the files contained no record of Swisher receiving or being awarded the Purple .Heart or any other medal or award. The government also introduced Exhibit 67, a photograph showing Swisher and another man in Marine Corps League uniforms.[5] In the photograph, Swisher is wearing several military medals and awards, and shaking hands with a person in civilian garb. The parties stipulated that the photograph was authentic. Lt. Col. Henson testified that the photograph showed Swisher wearing the Silver Star, Navy and Marine Corps Ribbon, Purple Heart, Navy and Marine Corps Commendation Medal with a Bronze ‘V.,” and UMC Expeditionary Medal. She reiterated that there was nothing “in the United States Marine Corps’ files ... to substantiate Mr. Swisher’s entitlement to wear any of those awards.” In addition, Jeffrey Shattuck, the head of the Records Correspondence Section for the Personnel Management Support Branch of the Marine Corps, outlined in detail the numerous indicia of fraud on Swisher’s replacement DD-214 that Swisher had used to verify his awards.
At the conclusion of the trial, the jury found Swisher guilty on all counts. The court imposed a below-guidelines sentence of 12 months and one day, with a three- *306 year term of supervised release. We affirmed Swisher’s conviction and sentence on appeal. United States v. Swisher, 360 Fed.Appx. 784 (9th Cir.2009).
Swisher subsequently challenged his conviction through a motion under 18 U.S.C. § 2255 and claimed that his conviction for wearing the medals violated the First Amendment under the reasoning of the Ninth Circuit’s intervening decision in United States v. Alvarez, 617 F.3d 1198 (9th Cir.2010). The district court denied the motion and an appeal followed. See United States v. Swisher, 790 F.Supp.2d 1215, 1245-46 (D.Idaho 2011); United States v. Swisher, 771 F.3d 514 (9th Cir. 2014).
While Swisher’s appeal was pending, the Supreme Court affirmed our decision in Alvarez, and held that § 704(b) unconstitutionally infringes upon speech protected by the First Amendment. See United States v. Alvarez, — U.S. -, 132 S.Ct. 2537, 183 L.Ed.2d 574 (2012). Nevertheless, we subsequently distinguished Alvarez, and held that § 704(a) survived First Amendment scrutiny. United States v. Perelman, 695 F.3d 866, 871-72 (9th Cir.2012) (as amended). Bound by Perelman, a three-judge panel rejected Swisher’s constitutional challenge to § 704(a). Swisher, 771 F.3d at 524. In his petition for rehearing, Swisher argued that § 704(a) was unconstitutional under the reasoning set forth in Alvarez and asked us to overrule our contrary decision in Perelman. We took the case en banc to reconsider this issue.
II
We review de novo a district court’s denial of relief to a federal prisoner under 28 U.S.C. § 2255. United States v. Aguirre-Ganceda, 592 F.3d 1043, 1045 (9th Cir.2010). Section 2255 is a substitute for habeas corpus relief for federal prisoners, see Davis v. United States, 417 U.S. 333, 343, 94 S.Ct. 2298, 41 L.Ed.2d 109 (1974), and allows a petitioner to file a motion to “vacate, set aside or correct” the petitioner’s conviction or sentence “upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack,” 28 U.S.C. § 2255(a).
In evaluating a § 2255 motion, we are not constrained by 28 U.S.C. § 2254(d), which precludes federal courts from granting habeas relief to a state prisoner with regard to any claim adjudicated on the merits unless the adjudication “resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established” Supreme Court precedent, or “resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.” Section 2255 does not have a similar restriction on review of claims by federal prisoners.
Although Swisher’s challenge to his conviction is based on a Supreme Court decision decided after his conviction became final, we are not barred from considering his claim. Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), generally precludes the application of “new constitutional rules of criminal procedure” to cases that “have become final before the new rules are announced.” Bousley v. United States, 523 U.S. 614, 619-20, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998) (internal quotation marks omitted). While Teague is applicable in the § 2255 context, see United States v. Sanchez-Cervantes, 282 F.3d 664, 667-68 (9th Cir. 2002), Teague does not bar the retroactive application of decisions holding “that a *307 substantive federal criminal statute does not reach certain conduct,” Bousley, 523 U.S. at 620, 118 S.Ct. 1604. Alvarez is a substantive decision of that sort.
Nor does Swisher’s failure to raise his constitutional claim at trial or on direct appeal prevent us from reviewing his claim. Although federal prisoners are generally barred from raising claims on collateral review that they could have raised on direct appeal, see Bousley, 523 U.S. at 621, 118 S.Ct. 1604, the government can waive a procedural default defense by failing to raise it, see United States v. Barron, 172 F.3d 1153, 1156-57 (9th Cir.1999) (en banc). Here, the government failed to raise the procedural default on appeal and does not dispute that it is waived.
Ill
To address Swisher’s arguments, we begin with a review of the reasoning in Alvarez and our subsequent interpretation of Alvarez in Perelman.
A
Alvarez considered the appeal of a defendant who was convicted under § 704(b) for introducing himself at a public meeting with a series of lies, including the false statement that “[b]ack in 1987, I was awarded the Congressional Medal of Honor.” 132 S.Ct. at 2542 (Kennedy, J., plurality opinion). The defendant challenged his conviction on the ground that § 704(b) was invalid under the First Amendment. Id. He won on appeal, and the government petitioned for certiorari. Id.
Because § 704(b) criminalized specific statements based on their falsity, the government did not dispute that the statute imposed a content-based restriction on speech. Rather, the government argued that false statements had “no First Amendment value in themselves,” id. at 2543, and so were protected “only to the extent needed to avoid chilling fully protected speech,” id. The Supreme Court rejected the government’s argument, and agreed that § 704(b) violated the First Amendment. Id. The Court could not, however, agree on the appropriate level of scrutiny for the sort of lies targeted by § 704(b). Id. at 2548 (Kennedy, J., plurality opinion), 2552 (Breyer, J., concurring).
Justice Kennedy, writing for four Justices, held that § 704(b) was subject to the “most exacting scrutiny.” Id. at 2548 (Kennedy, J., plurality opinion) (quoting Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 642, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994)). In reaching this conclusion, the plurality rejected the government’s argument that false statements had “no First Amendment value” and merited protection “only to the extent needed to avoid chilling fully protected speech.” Id. at 2543. While conceding that “content-based restrictions on speech have been permitted” for certain historical categories of speech, id. at 2544, the plurality concluded that the “Government has not demonstrated that false statements generally should constitute a new category of unprotected speech.” Id. at 2547. Nor did the plurality agree with the government’s argument that § 704(b) was analogous to regulations on false speech “that courts generally have found permissible,” such as laws prohibiting a false statement made to a Government official, laws punishing perjury, and prohibitions on falsely claiming to speak on behalf of the government. Id. at 2545-46. These examples, the plurality determined, were confined to circumscribed contexts. Id. at 2546. Certain statutes prohibiting impersonation of a government official, for instance, “protect the integrity of Government processes, quite apart from merely restricting false speech,” and may be limit *308 ed to “maintaining] the general good repute and dignity of ... government ... service itself.” Id. at 2546 (quoting United States v. Lepowitch, 318 U.S. 702, 704, 63 S.Ct. 914, 87 L.Ed. 1091 (1943) (alterations in original)). The plurality concluded that these types of permissible speech regulations did not encompass the “sweeping, quite unprecedented reach” of § 704(b). Id. at 2547.
Having concluded that false statements of the sort proscribed in § 704(b) constituted protected speech, the plurality subjected the statute to “exacting scrutiny,” which required that (1) the government have a compelling interest; (2) “the Government’s chosen restriction on the speech at issue be actually necessary to achieve its interest,” and (3) “[tjhere must be a direct causal link between the restriction imposed and the injury to be prevented.” Id. at 2549 (internal quotation marks omitted). Applying this test to § 704(b), the plurality held that the statute served a compelling government interest in protecting “the integrity of the military honors system,” id. at 2548, but the statute’s restriction was not “actually necessary” because the government’s interest could be satisfied by counterspeech, including a “Government-created database [that] could list Congressional Medal of Honor winners.” Id. at 2549-51. Further, the government had not shown “[t]he link between the Government’s interest in protecting the integrity of the military honors system and the Act’s restriction on the false claims of liars,” because it failed to support “its claim that the public’s general perception of military awards is diluted by false claims.” Id. at 2549. Accordingly, the plurality concluded that § 704(b) violated the First Amendment. Id. at 2551.
Justice Breyer concurred in the judgment on the ground that § 704(b) “works disproportionate constitutional harm” under his formulation of intermediate scrutiny. Id. at 2556 (Breyer, J., concurring). In his concurrence, Justice Breyer stated that to determine whether a statute violates the First Amendment, the Court generally examines “the fit between statutory ends and means.” Id. at 2551. In conducting a review of a governmental enactment under this standard, a court must (1) take “account of the seriousness of the speech-related harm the provision will likely cause”; (2) consider “the nature and importance of the provision’s countervailing objectives,” and (3) weigh “the extent to which the provision will tend to achieve those objectives, and whether there are other, less restrictive ways of doing so.” Id.
In applying this test to § 704(b), Justice Breyer first considered the “speech-related harm” caused by this enactment. Id. at 2551-52. Justice Breyer interpreted § 704(b) as “criminalizing only false factual statements made with knowledge of their falsity and with the intent that they be taken as true.” Id. at 2552-53. He acknowledged that regulation of false statements “endangers First Amendment values” less than other restrictions, id. at 2553, and noted that “many statutes and common-law doctrines make the utterance of certain kinds of false statements unlawful,” id. at 2253-54. But in Justice Breyer’s view, such statutes and doctrines work less speech-related harm because they typically “narrow the statute to a subset of lies where specific harm is more likely to occur.” Id. at 2555. For instance, laws punishing fraud, defamation, or intentional infliction of emotional distress generally “requir[e] proof of specific harm to identifiable victims,” and statutes prohibiting the impersonation of a public official “may require a showing that, for example, someone was deceived into following a ‘course [of action] he would not have pursued but for the deceitful conduct.’” Id. at 2554 *309 (alteration in original) (quoting Lepomtch, 318 U.S. at 704, 63 S.Ct. 914). Other similar laws specify “that the lies be made in contexts in which a tangible harm to others is especially likely to occur,” such as laws punishing perjury or lying to a government official, or trademark statutes which are “focused upon commercial and promotional activities that are likely to dilute the value of a mark.” Id. Finally, statutes prohibiting false claims of terrorist attacks or other lies about crimes or catastrophes, are limited to false statements that “are particularly likely to produce harm,” and generally require proof of foreseeability of substantial public harm. Id.
According to Justice Breyer, § 704(b) lacked these narrowing features because it was not limited to a subset of lies causing specific harm to identifiable victims, or to a specific context where foreseeable harm to others is likely to occur. Id. at 2555-56. Because “[fjalse factual statements can serve useful human objectives” in a variety of contexts and “the threat of criminal prosecution” could have a chilling effect and could encourage or permit selective prosecution for political ends, id. at 2553, Justice Breyer concluded that § 704(b) “risks significant First Amendment harm,” id. at 2555.
Having reached this conclusion, Justice Breyer then turned to consider “the nature and importance of the provision’s countervailing objectives,” id. at 2551, and concluded that § 704(b) has a “substantial countervailing objective” because ,“[i]t seeks to protect the interests of those who have sacrificed their health and life for their country,” and is aimed at avoiding dilution of “the country’s recognition of that sacrifice in the form of military honors,” id. at 2555.
Finally, Justice Breyer turned to his third prong, consideration of “the extent to which the provision will tend to achieve those objectives, and whether there are other, less restrictive ways of doing so.” Id. at 2551. Here, Justice Breyer concluded that it was “possible substantially to achieve the Government’s objective in less burdensome ways.” Id. at 2555. According to Justice Breyer, Congress could enact a more limited statute that adopted some of the narrowing strategies used in othér statutes and common law doctrines punishing false speech, such as (1) requiring a showing that the false statements caused a specific harm, (2) requiring that the lies be made in a context “where such lies are most likely to cause harm,” or (3) focusing on the more important military awards that Congress most values. Id. at 2555-56. Such a more narrowly tailored statute could be combined with “information-disseminating devices,” such as “an accurate, publicly available register of military awards, easily obtainable by political opponents.” Id. at 2556. Because the government failed to explain why a more limited statute along with a method for providing more accurate information would not “significantly reduce the threat of First Amendment harm while permitting the statute to achieve its important protective objective,” Justice Breyer concluded that “the statute as presently drafted works disproportionate constitutional harm” and “so violates the First Amendment.” Id.
B
In analyzing the constitutionality of § 704(b), Alvarez did not directly address the closely related section of the Stolen Valor Act, § 704(a), which is before us here. We first had occasion to consider a constitutional challenge to that section in United States v. Perelman, decided two months after the Supreme Court issued its opinion in Alvarez. 695 F.3d 866.
*310 Before considering the applicability of Alvarez, Perelman considered the defendant’s overbreadth challenge to § 704(a). Perelman rejected this argument by construing the statute narrowly as criminalizing only the unauthorized wearing of medals “when the wearer intends to deceive.” Id. at 870 (emphasis omitted).
Perelman then considered whether § 704(a), as construed, would survive First Amendment scrutiny. Although the Alvarez plurality had applied “exacting scrutiny” to § 704(b), Perelman did not use this analytic framework because § 704(a) did not criminalize speech, but rather criminalized “the harmful conduct of wearing a medal without authorization and with intent to deceive.” Id. at 871. Perelman reasoned that “[e]ven if we assume that the intentionally deceptive wearing of a medal contains an expressive element — the false statement that T received a medal’— the distinction between pure speech and conduct that has an expressive element separates this . case from Alvarez.” Id. Because, in Perelman’s view, § 704(a) criminalized conduct, it was more akin to the impersonation statutes discussed in Alvarez, or statutes prohibiting “the unauthorized wearing of military uniforms.” Id. at 872 (citing Schacht v. United States, 398 U.S. 58, 90 S.Ct. 1555, 26 L.Ed.2d 44 (1970)).
Presumably because of its determination that § 704(a) primarily criminalized conduct, but without further analysis, Perelman applied the test set forth in United States v. O’Brien, 391 U.S. 367, 377, 88 S.Ct. 1673, 20. L.Ed.2d 672 (1968) (upholding the conviction of a draft protester under a content-neutral law prohibiting knowing destruction of draft cards). 695 F.3d at 872. Applying O’Brien’s three-part test, Perelman first held that the government had “a compelling interest in ‘preserving the integrity of its system of honoring our military men and women for their service and, at times, their sacrifice.’ ” Id. (quoting Alvarez, 617 F.3d at 1216). Second, the government’s interests were “unrelated to the suppression of free expression” because the statute “does not prevent the expression of any particular message or viewpoint.” Id. And third, “the incidental restriction on alleged First Amendment freedoms” was “no greater than is essential to the furtherance of that interest,” because, “even if § 704(a) is not the most effective mechanism, in at least some measure it promotes the goals of maintaining the integrity of the military’s medals and preventing the fraudulent wearing of military medals.” Id. at 872-73. Accordingly, Perelman rejected the defendant’s facial First Amendment challenge to § 704(a). Id. at 873.
IV
Perelman based its conclusion that § 704(a) did not violate the First Amendment on two grounds. First, Perelman distinguished between written or spoken speech on the one hand and expressive conduct on the other. Id. at 871. Second, Perelman implicitly determined that expressive conduct is per se subject to scrutiny under the test set forth in O’Brien. Id. at 872. Our reconsideration of Perelman requires us' to review both these issues regarding the First Amendment framework for analyzing communicative conduct.
A
The First Amendment provides that “Congress shall make no law ... abridging the freedom of speech.” U.S. Const.amend. I. While “[t]he First Amendment literally forbids the abridgment only of ‘speech,’ ” the Supreme Court has “long recognized that its protection does not end at the spoken or written word.” Texas v. Johnson, 491 U.S. 397, 404,109 S.Ct. 2533, *311 105 L.Ed.2d 342 (1989). A message “delivered by conduct that is intended to be communicative and that, in context, would reasonably be understood by the viewer to be communicative,” Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 294, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984), is symbolic speech that falls “within the scope of the First and Fourteenth Amendments.” Johnson, 491 U.S. at 404, 109 5.Ct. 2533; see also Nunez v. Davis, 169 F.3d 1222, 1226 (9th Cir.1999) (“Non-verbal conduct implicates the First Amendment when it is intended to convey a ‘particularized message’ and the likelihood is great that the message would be so understood.” (quoting Johnson, 491 U.S. at 404, 109 S.Ct. 2533)). For instance, “the wearing of an armband for the purpose of expressing certain views is the type of symbolic act that is within the Free Speech Clause of the First Amendment” and is “closely akin to ‘pure speech.’” Tinker v. Des Moines Indep. Cmty. Sch. Disk, 393 U.S. 503, 505, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). Similarly, the Court has “recognized the expressive nature of ... a sit-in by blacks in a ‘whites only’ area to protest segregation,” Johnson, 491 U.S. at 404,109 S.Ct. 2533 (citing Brown v. Louisiana, 383 U.S. 131, 141-42, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966)), and “of the wearing of American military uniforms in a dramatic presentation criticizing American involvement in Vietnam,” id. (citing Schacht, 398 U.S. 58, 90 S.Ct. 1555).
While the Court has rejected the notion that “an apparently limitless variety of conduct can be labeled ‘speech’ whenever the person engaging in the conduct intends thereby to express an idea,” O’Brien, 391 U.S. at 376, 88 S.Ct. 1673, there is no doubt that the use of recognized symbols, such as emblems or flags, constitutes symbolic speech, Johnson, 491 U.S. at 404, 109 S.Ct. 2533. “The use of an emblem or flag to symbolize some system, idea, institution, or personality, is a short cut from mind to mind,” and “a primitive but effective way of communicating ideas.” W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 632, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943); see also Anderson v. City of Hermosa Beach, 621 F.3d 1051, 1061 (9th Cir.2010) (“Tattoos are generally composed of words, realistic or abstract images, symbols, or a combination of these, all of which are forms of pure expression that are entitled to full First Amendment protection.”). In this context, the Court has frequently recognized “the communicative nature of conduct” relating to the American flag, which “as readily signifies this Nation as does the combination of letters found in ‘America.’ ” Johnson, 491 U.S. at 405-06, 109 S.Ct. 2533. Because “[t]he very purpose of a national flag is to serve as a symbol of our country,” id. at 405,109 S.Ct. 2533, such acts as attaching a peace sign to the American flag, Spence v. Washington, 418 U.S. 405, 409-11, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974), refusing to salute the flag, Bar-nette, 319 U.S. at 632-33, 63 S.Ct. 1178, or burning the flag, Johnson, 491 U.S. at 405-06, 109 S.Ct. 2533, constitute symbolic speech that “may find shelter under the First Amendment.” Id. at 405, 109 S.Ct. 2533.[6]
In adjudicating a First Amendment challenge to a government enactment that regulates speech, the Supreme Court considers whether the enactment is content-based or content-neutral. See Reed v. *312 Town of Gilbert, — U.S. -, 135 S.Ct. 2218, 2226-27, 192 L.Ed.2d 236 (2015). This threshold inquiry is the same for symbolic speech as it is for enactments that regulate spoken or written words. See Johnson, 491 U.S. at 403, 109 S.Ct. 2533 (holding that if the conduct at issue is communicative in nature, the Court must first determine “whether the State’s regulation is related to the suppression of free expression”). Even where an enactment “contains no explicit content-based limitation on the scope of prohibited conduct,” United States v. Eichman, 496 U.S. 310, 315, 110 S.Ct. 2404, 110 L.Ed.2d 287 (1990), a court must consider whether the law “suppresses expression out of concern for its likely communicative impact,” id. at 317, 1.10 S.Ct. 2404. See also Nordyke v. King, 319 F.3d 1185, 1189-90 (9th Cir. 2003) (rejecting a First Amendment challenge to an ordinance barring the possession of firearms on County-owned property because it was not aimed at the communicative impact of firearm possession).
If the purpose of a law regulating conduct is aimed at the conduct itself, rather than at the message conveyed by that conduct, the regulation is subject to the lesser scrutiny given to content-neutral restrictions. Put differently, lesser scrutiny applies if the government’s interest in such a regulation “is unrelated to the suppression of free speech.” Clark, 468 U.S. at 294, 104 S.Ct. 3065. In such circumstances, and only in such circumstances, the O’Brien test is applicable. See Doe v. Reed, 586 F.3d 671, 678 (9th Cir.2009) (assuming that signing a referendum petition is expressive conduct subject to the O’Brien test); Corales v. Bennett, 567 F.3d 554, 567 (9th Cir.2009) (analyzing “the school’s policy of disciplining truancies and leaving campus without permission” under O’Brien’s “intermediate scrutiny applied to content-neutral rules of conduct.”). To pass the O’Brien test, however, the regulation must be “narrowly drawn to further a substantial governmental interest.” Clark, 468 U.S. at 294, 104 S.Ct. 3065.[7]
On the other hand, where the government’s aim is to regulate the message conveyed by expressive conduct, the content-neutral O’Brien test is not applicable. Nor may it be applied unless “the conduct itself may constitutionally be regulated.” Id. As explained in Johnson, “[i]f the State’s regulation is not related to expression, then the less stringent standard we announced in United States v. O’Brien for regulations of noncommunicative conduct controls,” but “[i]f it is, then we are outside of O’Brien’s test” and the regulation must survive “under a more demanding standard.” 491 U.S. at 403, 109 S.Ct. 2533; see also Spence, 418 U.S. at 412, 414 n. 8, 94 S.Ct. 2727 (concluding that the state’s interest in “preserving the national flag as an unalloyed symbol of our country” was directly related to expression, and accordingly “the four-step analysis of United States v. O’Brien is inapplicable”); Nordyke, 319 F.3d at 1189 (stating that if an ordinance barring the possession of firearms on County property is “related to the suppression of free expression” then a First Amendment challenge to the ordinance must be analyzed under Johnson; if not, the O’Brien test applies.). Accordingly, if a government enactment is “directed at the communicative nature of conduct” *313 then it is content-based, and “must, like a law directed at speech itself, be justified by the substantial showing of need that the First Amendment requires.” Johnson, 491 U.S. at 406, 109 S.Ct. 2533 (emphasis omitted) (quoting Cmty. for Creative Non-Violence v. Watt, 703 F.2d 586, 622-623 (D.C.Cir.1983) (Scalia, J., dissenting), rev’d sub nom. Clark, 468 U.S. 288, 104 S.Ct. 3065).
The Supreme Court has recently provided authoritative direction for differentiating between content-neutral and content-based enactments. See Reed, 135 S.Ct. at 2226-27. Reed explained that “[gjovernment regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed.” Id. at 2227. If “a regulation of speech ‘on its face’ draws distinctions based on the message a speaker conveys,” it is a content-based regulation. Id. Laws that are facially content-neutral, but “cannot be justified without reference to the content of the regulated speech, or that were adopted by the government because of disagreement with the message [the speech] conveys,” are also content-based and subject to scrutiny under a higher standard. Id. (alteration in original) (internal quotation marks and citation omitted). Government regulations of symbolic speech frequently fall into this second category of content-based prohibitions. For instance, where a state prohibited burning the American flag because it might lead people to believe that the flag does not stand for the positive concepts of “nationhood and national unity,” the Court was quick to conclude that such “concerns blossom only when a person’s treatment of the flag communicates some message, and thus are related to the suppression of free expression.” Johnson, 491 U.S. at 410, 109 S.Ct. 2533 (internal quotation marks omitted). Such a content-based regulation is “outside of O’Brien’s test altogether.” Id.
Even if a challenged restriction is content-based, it is not necessarily subject to strict scrutiny. Although “[c]ontentbased regulations are presumptively invalid,” the Court “has permitted restrictions upon the content of speech in a few limited areas, which are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.” R.A.V. v. City of St. Paul, 505 U.S. 377, 382-83, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) (internal quotation marks omitted) (indicating that obscenity, defamation, and fighting words fall within this category). Both the plurality and concurring opinions in Alvarez recognized the existence of “historical” and traditional categories of content-based restrictions that are not subject to strict scrutiny under the First Amendment and which courts have generally found permissible. Alvarez, 132 S.Ct. at 2544 (Kennedy, J., plurality opinion) (explaining that content-based restrictions on speech have 'been permitted only for a “few historic and traditional categories” of speech, including incitement, obscenity, defamation, speech integral to criminal conduct, so-called “fighting words,” child pornography, fraud, true threats, and “speech presenting some grave and imminent threat the government has the power to prevent”); id. at 2553-54 (Breyer, J., concurring) (internal quotation marks omitted) (referencing additional “statutes and common-law doctrines” that make “utterance of certain kinds of false statements unlawful,” including torts involving intentional infliction of emotional distress, lying to a government official, false claims of terrorist attacks or other lies about the commission of crimes or catastrophes, impersonation *314 of an officer, and trademark infringement, among others).
B
Applying these principles to Swisher’s facial challenge to § 704(a), we first ask whether this statute regulates speech. It clearly does. According to the government, the purpose of a military medal is to communicate “that the recipient has served the military efforts of the United States with valor, exceptional duty, or achievement worthy of commendation.” The value of a military medal lies not in the materials of which it is comprised, but in its message; it is “a primitive but effective way of communicating ideas,” Barnette, 319 U.S. at 632, 63 S.Ct. 1178. Wearing a medal, like wearing a black armband or burning an American flag, conveys a message “by conduct that is intended to be communicative and that, in context, would reasonably be understood by the viewer to be communicative,” Clark, 468 U.S. at 294, 104 S.Ct. 3065. Specifically, wearing a medal communicates that the wearer was awarded that medal and is entitled to the nation’s recognition and gratitude “for acts of heroism and sacrifice in military service.” Alvarez, 132 S.Ct.- at 2548 (Kennedy, J., plurality opinion) (internal quotation mark omitted). Wearing a medal without authorization, therefore, generally communicates the false message that the wearer is entitled to such recognition and gratitude. Because wearing a medal 'is symbolic speech, and § 704(a) precludes the unauthorized wearing of a medal, we conclude that § 704(a) regulates speech.
We next determine whether § 704(a) is a content-based or content-neutral restriction of symbolic speech. See Johnson, 491 U.S. at 403, 109 S.Ct. 2533. As in Johnson, the purpose of § 704(a) is to stop a particular message: the misappropriation or distortion of the message of valor conveyed by a medal. See Alvarez, 132 S.Ct. at 2549 (noting the government’s argument that the purpose of the Stolen Valor Act is to avoid diluting “the value and meaning of military awards”). Because these “concerns blossom,” Johnson, 491 U.S. at 410, 109 S.Ct. 2533, only when a person’s unauthorized wearing of a medal communicates a false message, we conclude that § 704(a) “suppresses expression out of concern for its likely communicative impact,” Eichman, 496 U.S. at 317, 110 S.Ct. 2404, and is a content-based restriction on speech.
As such, the tests applicable to content-neutral regulations (the time, place, or manner test, and the O’Brien test) are not applicable here. Johnson, 491 U.S. at 410, 109 S.Ct. 2533 (stating that a content-based regulation is “outside of O’Brien’s test altogether”). Instead, § 704(a) “must, like a law directed at speech itself, be justified by the substantial showing of need that the First Amendment requires,” Johnson, 491 U.S. at 406, 109 S.Ct. 2533. In light of this analysis, we conclude that Perelman erred in applying the test set forth in O’Brien, which applies only to content-neutral enactments.[8]
*315 c
Because § 704(a) is a content-based regulation of false symbolic speech, it is closely analogous to § 704(b). Indeed, both statutes bar lies about having received a military medal. Accordingly, we review the constitutionality of § 704(a) under the tests enunciated in the plurality and concurring opinions in Alvarez. If they apply to § 704(a) in the same manner as they apply to § 704(b), the reasoning of Alvarez requires us to hold that § 704(a) is also unconstitutional.
We begin by considering the standard set forth in Justice Breyer’s concurring opinion, which reviewed the constitutionality of § 704(b) under a less demanding test than the plurality .required. As a threshold matter, Justice Breyer interpreted § 704(b) favorably to the government as proscribing “only false factual statements made with knowledge of their falsity and with the intent that they be taken as true.” Alvarez, 132 S.Ct. at 2552-53 (Breyer, J., concurring). We adopt the same narrowing construction of § 704(a), and interpret it as ■ proscribing unauthorized persons from wearing military medals for the purpose of falsely communicating that they have been awarded such medals. See also Perelman, 695 F.3d at 871 (concluding that a person violates § 704(a) only “if he or she has an intent to deceive”).
The first prong of Justice Breyer’s intermediate scrutiny test requires consideration of “the seriousness of the speech-related harm the provision will likely cause.” Alvarez, 132 S.Ct. at 2551. Justice Breyer noted that the narrowing interpretation of § 704(b) “diminishes the extent to which the statute endangers First Amendment values.” Id. at 2553. Because we have adopted the same narrowing interpretation for § 704(a), the same conclusion applies.[9]
But like § 704(b), § 704(a) lacks the limiting features that, in Justice Breyer’s view, justified other statutes and common law doctrines punishing the communication of false statements. Id. at 2553-54. Section 704(a) does not require “proof of specific harm to identifiable victims,” or that “someone was deceived into following a course [of action] he would not have pursued but for the deceitful conduct,” or specify “that the lies be made in contexts in which a tangible harm to others is especially likely to occur.” See id. at 2254 (alteration in original) (internal citations and quotation marks omitted). Nor is § 704(a) limited to false statements that “are particularly likely to produce harm.” See id. Accordingly, we conclude that under Justice Breyer’s test, § 704(a), like § 704(b), “creates a significant risk of First Amendment harm.” Id. at 2555.
Arguing against this conclusion, the government asserts that § 704(a) is analogous to statutes prohibiting trademark infringement such as the Lanham Act, since it prevents misappropriation of governmental property. Justice Breyer rejected a similar argument, concluding that § 704(b) had a broader reach than trademark statutes, which are typically “focused upon commer *316 cial and promotional activities that are likely to dilute the value of a mark,” and would “typically require a showing of likely confusion, a showing that tends to assure that the feared harm will in fact take place.” Id. at 2554. Because § 704(a) has the same broad reach as § 704(b), and likewise does not require that a specified harm (such as public confusion) will take place, the same analysis applies here, and we likewise reject the government’s contention.-
In reaching the conclusion that suppressing a symbolic communication threatens the same First Amendment harm as suppressing a spoken communication, we again part ways with Perelman. Although Perelman distinguished § 704(a) from § 704(b) on the ground that “[t]he use of a physical object goes beyond mere speech and suggests that the wearer has proof of the lie, or government endorsement of it,” 695 F.3d at 871, we see no basis for Perelman’s conclusion that wearing a medal is more probative than speaking a lie. Cf. Kevin Jon Heller, The Cognitive Psychology of Circumstantial Evidence, 105 Mich. L.Rev. 241, 248-52 (2006) (noting, as an empirical matter, that jurors give more weight to testimony, such as eyewitness identifications and confessions, than to physical evidence, such as blood and fingerprints). As a practical matter, the government’s concession at oral argument that military medals are freely available for purchase confirms that the probative value of owning a medal or other military decoration is minimal. In any event, wearing a medal has no purpose other than to communicate a message. We therefore see no principled basis for distinguishing a spoken communication from a symbolic communication in this context.
We also reject Perelman’s reasoning that § 704(a) is like the statutes described in Alvarez that prohibit impersonation of government officials, like 18 U.S.C. § 912, or the unauthorized wearing of military uniforms, like 18 U.S.C. § 702, which the Court assumed (without deciding) was valid. See 695 F.3d at 872 (citing Schacht, 898 U.S. at 61, 90 S.Ct. 1555). As Justice Breyer pointed out, “[sjtatutes forbidding impersonation of a public official typically focus on acts of impersonation, not mere speech, and may require a showing that, for example, someone was deceived into following a course [of action] he would not have pursued but for the deceitful conduct.” Alvarez, 132 S.Ct. at 2554 (Breyer, J., concurring) (alteration in original) (internal quotation marks omitted). But § 704(a), like § 704(b), requires no act beyond the false communication itself. While there is a quantum of conduct involved in pinning on a medal, it is not materially different from the quantum of conduct involved in speaking or writing. Nor does § 704(a) require proof that anyone was deceived into taking a course of action. We also reject Perelman’s reliance on Schacht to support its conclusion that § 704(a) survives First Amendment scrutiny. Schacht itself merely held that even if the government could constitutionally prohibit a person from wearing a military uniform without authorization, Congress may not make “it a crime for an actor wearing a military uniform to say things during his performance critical of the conduct or policies of the Armed Forces.” 398 U.S. at 62-63, 90 S.Ct. 1555; see also R.A.V., 505 U.S. at 430-31 (interpreting Schacht as precluding viewpoint discrimination). Neither Schacht nor any other Supreme Court case examined a First Amendment challenge to statutes precluding wearing military uniforms without authorization, and both the Alvarez plurality and concurring opinion indicated that laws prohibiting impersonation of an officer are distinguishable from false claims of entitlement to a military medal. See Alvarez, *317 132 S.Ct. at 2546 (Kennedy, J., plurality opinion); id. at 2254 (Breyer, J., concurring).[10]
The second prong of Justice Breyer’s intermediate scrutiny test requires an evaluation of “the nature and importance of the provision’s countervailing objectives.” Id. at 2551. We conclude that the government had the same compelling interest in enacting § 704(a) as it did in enacting § 704(b): in both cases, the government has a “substantial countervailing objective” of avoiding dilution of “the country’s recognition of [award recipients’] sacrifice in the form of military honors.” Id. at 2555; see also Hamilton, 699 F.3d at 371 (“Accordingly, we hold that the government’s interest in preserving the integrity of the system honoring military members for their achievements and sacrifices is compelling.”).[11]
Finally, we consider the third prong of Justice Breyer’s test: “the extent to which the provision will tend to achieve those objectives, and whether there are other, less restrictive ways of doing so.” Alvarez, 132 S.Ct. at 2551. As explained in Alvarez, Congress could adopt narrowing strategies to limit the breadth of the prohibition, and could establish “information-disseminating devices,” such as “an accurate, publicly available register of military awards, easily obtainable by political opponents.” Id. at 2556. These alternative means to meeting the government’s goals in enacting § 704(b) would be equally effective to meet the government’s stated goals for § 704(a), namely to preserve the integrity of the military honors system and protect the symbolic value of military medals.[12]
Given that the statute fails Justice Breyer’s intermediate scrutiny test, it also fails under the plurality’s exacting scrutiny test. See id. at 2543 (Kennedy, J., plurality opinion).[13] The plurality’s conclusion that the compelling interest served by § 704(b) could be satisfied by a database of medal winners, and that there is an insufficient causal link between the government’s compelling interest and the restriction “on the false claims of liars,” is equally applicable to § 704(a). See id. at 2549-50.
V
Alvarez clarified that lies do not fall into a category of speech that is ex *318 cepted from First Amendment protection. 132 S.Ct. at 2546-47 (Kennedy, J., plurality opinion); id. at 2553 (Breyer, J., concurring). Given that clarification, our analysis follows a familiar road. Content-based prohibitions of speech and symbolic speech are analyzed under the same framework, and so Alvarez dictates our conclusion that § 704(a) violates the First Amendment. Because § 704(a) was unconstitutionally applied to Swisher’s conduct, the district court erred in denying Swisher relief under 28 U.S.C. § 2255. We therefore reverse the district court and overrule Perelman to the extent inconsistent with this opinion.[14]
REVERSED.

. The then-applicable provision read:
Whoever falsely represents himself or her *304 self, verbally or in writing, to have been awarded any decoration or medal authorized by Congress for the Armed Forces of the United States ... shall be fined under this title, imprisoned not more than six months, or both.
18 U.S.C. § 704(b) (2011 ed.).

. The provision read in full:
Whoever knowingly wears, purchases, attempts to purchase, solicits for purchase, mails, ships, imports, exports, produces blank certificates of receipt for, manufactures, sells, attempts to sell, advertises for sale, trades, barters, or exchanges for anything of value any decoration or medal authorized by Congress for the armed forces of the United States, or any of the service medals or badges awarded to the members of such forces, or the ribbon, button, or rosette of any such badge, decoration or medal, or any colorable imitation thereof, except when authorized under regulations made pursuant to law, shall be fined under this title or imprisoned not more than six months, or both.
18 U.S.C. § 704(a) (2002 ed.).
Before we agreed to rehear this case en banc, § 704(a) was amended to remove the word “wears” from the list of prohibited actions with respect to decorations and medals authorized by Congress. See 18 U.S.C. § 704(a) (2013 ed.). That is, § 704(a) no longer prohibits the conduct for which Swisher was convicted. Because Swisher was convicted under the prior version of the statute, however, the case is not moot. See Carafas v. LaVallee, 391 U.S. 234, 239, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968) (holding that a challenge to a criminal conviction is not moot when the defendant continues to face adverse consequences from the conviction).

. Swisher's other claims were previously addressed in an unpublished memorandum disposition. United States v. Swisher, 585 Fed.Appx. 605 (9th Cir.2014). We agree with the three-judge panel's reasons for rejecting Swisher's other arguments, and we adopt them as our own.

. Swisher’s claim that he was awarded a Purple Heart became a key issue in a criminal trial involving defendant David Hinkson, who was on trial for solicitation of murder. See United States v. Hinkson, 585 F.3d 1247, 1254-57 (9th Cir.2009) (en banc). The parties agreed that any evidence related to the Hinkson trial would be excluded from Swisher's trial.

. The Marine Corps League is a Congressionally chartered veterans organization that has its own Marine-related uniforms. See 36 U.S.C. §§ 140101-04.

. The dissent’s contention that courts should analyze laws burdening symbolic speech conveyed by a "physical emblem,” such as a flag or a medal, differently than they analyze laws burdening oral or written speech, Dis. op. at 320-21, is inconsistent with these precedents. Indeed, the dissent cites no case supporting its views.

. The test for "time, place, or manner restrictions” may also be applicable to a content-neutral regulation of symbolic conduct. Clark, 468 U.S. at 293, 104 S.Ct. 3065. There is, however, “little, if any, differen[ce]” between the two tests. See Clark, 468 U.S. at 298, 104 S.Ct. 3065; see also Vlasak v.Super. Ct. of Cal., 329 F.3d 683, 691 (9th Cir.2003) (noting that O’Brien is “nearly identical to the time, place and manner test”). Because Perelman applied O'Brien, we focus on the O'Brien standard.

. United. States v. Hamilton, 699 F.3d 356 (4th Cir.2012), engaged in a similar analysis, correctly noting that “the key factor that determines whether we apply the ‘relatively lenient’ test employed in O’Brien, or the ‘most exacting scrutiny’ standard set forth in Johnson, is whether the statute being reviewed is related to the suppression of free expression.’’ Id. at 370. The Fourth Circuit further acknowledged that when § 704(a) is construed as requiring an intent to deceive, it "could reach conduct that solely involves free expression, within the holding of Johnson.” Id. at 371. The Fourth Circuit ultimately did not determine whether § 704(a) was symbolic speech because it concluded, erroneously in our view, that § 704(a) survived strict scrutiny. See id.

. Because both § 704(a), see supra at 314-15, and § 704(b), see Alvarez, 132 S.Ct. at 2552-53, prohibit only lies made knowingly and with an intent to deceive, both provisions impose an identical speech-related harm: burdening the speech of a person who intentionally chooses to lie, see Alvarez, 132 S.Ct. at 2555-56. And in prosecuting either statute, the government would be required to prove beyond a reasonable doubt that the defendant had the requisite mens rea. Therefore, we reject the dissent’s argument that § 704(b) would have a greater chilling effect and pose a greater risk of selective prosecution than § 704(a) because a person could thoughtlessly lie but could not thoughtlessly wear an unauthorized medal. Dis. op. at 321-22.

. Contrary to the dissent, our analysis does not necessarily invalidate 18 U.S.C. § 709. Cf. Dis. op at 319-20. Because § 709 is limited to precluding false representations in certain limited contexts (such as in the field of banking, finance, or law enforcement) where "a tangible harm to others is especially likely to occur,” Alvarez, 132 S.Ct. at 2554 (Breyer, J., plurality opinion), it is distinguishable from § 704(a).

. We are sympathetic to the dissent’s description of the government’s powerful interest in protecting the message of valor and heroism that is conveyed by a medal. Dis. op. at 322-24. But because we already conclude that the government's interest in preventing the wearing of unauthorized medals is compelling, the dissent’s further elaboration does not affect our First Amendment analysis.

. The dissent’s arguments to the contrary, see Dis. op. at 324-25, are based on its view that symbolic speech involving a physical emblem is qualitatively different than spoken or written speech, a position inconsistent with Johnson, 491 U.S. at 403-04, 109 S.Ct. 2533. For the same reason, we disagree with Hamilton’s conclusion that § 704(a) survives strict scrutiny because a database is inadequate to counter symbolic speech involving a physical object. 699 F.3d at 373.

. Although Alvarez lacked a majority opinion, we need not determine whether the plurality opinion or Justice Breyer's opinion constitutes the holding of the Court, see Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977), because we reach the same conclusion under either standard.

. The government also argues that § 704(a) is not subject to the First Amendment because military medals convey government speech. In support, the government relies on Walker v. Texas Division, Sons of Confederate Veterans, Inc., which held that Texas could reject a proposed design for specialty license plates without violating the First Amendment because license plate designs constitute government speech. - U.S. -, 135 S.Ct. 2239, 2243-45, 192 L.Ed.2d 274 (2015). But § 704(a) does not regulate the design of military medals or other government speech; rather, it punishes an individual’s false communication regarding the entitlement to wear a military medal. As such, Walker does not help the government here.